```
 1                IN THE UNITED STATES DISTRICT COURT

 2               FOR THE WESTERN DISTRICT OF OKLAHOMA

 3

 4    UNITED STATES OF AMERICA,

 5            Plaintiff,

 6    vs.                          Case No. CR-24-146-R

 7    CHONG I PHU,
      MATTHEW ALAN STACY,
 8    CHANH I PHU,

 9            Defendants.

10    ----------------------------

11

12

13

14                TRANSCRIPT OF MOTION HEARING

15          BEFORE THE HONORABLE DAVID L. RUSSELL

16              UNITED STATES DISTRICT JUDGE

17                   JANUARY 29, 2025

18                      9:00 A.M.

19                      VOLUME II

20

21

22

23

24

25    Proceedings reported by mechanical stenography; transcript
      produced by computer-aided transcription.
```

```
1                              APPEARANCES

2   FOR THE GOVERNMENT:  Mr. Nicholas M. Coffey and Ms. Elizabeth
    Maeve Bagwell, Assistant United States Attorneys, United States
3   Attorney's Office, 210 W. Park Ave., Suite 400, Oklahoma City,
    OK 73102

4

5   FOR DEFENDANT CHONG I PHU:  Mr. Patrick William Blegen, Blegen
    & Associates, 53 West Jackson Blvd., Suite 1424, Chicago, IL
6   60604

7

8   FOR DEFENDANT MATTHEW ALAN STACY:  Mr. Robert M. Goldstein, Law
    Office of Robert Goldstein, 20 Park Plaza, Suite 1000, Boston,
9   MA 02116
    Mr. Joshua Todd Welch and Mr. Joseph L. DeGiusti, and
10  Ms. Allison Christian, DeGiusti & Welch, PLLC, 3721 N. Classen
    Blvd., Oklahoma City, OK 73118

11

12  FOR DEFENDANT CHANH I PHU:  Mr. Robert Don Gifford, II, Gifford
    Law, PLLC, PO Box 2682, Oklahoma City, OK 73101

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    EXAMINATION INDEX

 2   GOVERNMENT'S WITNESSES:

 3   JESSICA McGUIRE
          DIRECT BY MS. BAGWELL                293
 4        CROSS BY MR. GOLDSTEIN               313
          REDIRECT BY MS. BAGWELL             337
 5        RECROSS BY MR. GOLDSTEIN            343

 6   ALICIA MARTINEZ
          DIRECT BY MR. COFFEY                 349
 7        CROSS BY MR. GOLDSTEIN               368
          REDIRECT BY MR. COFFEY              417
 8        RECROSS BY MR. GOLDSTEIN            425

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

 1          (Proceedings had on January 29, 2025, with Court, counsel,

 2    and Defendant Stacy at defense table.)

 3              THE COURT:  All right.  Call your next witness.

 4              MS. BAGWELL:  United States calls Jessica McGuire.

 5                        JESSICA McGUIRE,

 6       called as a witness on behalf of the government, having

 7    been first duly sworn to tell the truth, testified as follows:

 8                        DIRECT EXAMINATION

 9    BY MS. BAGWELL:

10    Q.   Good morning.  Please state your name for the record.

11    A.   Jessica McGuire.

12    Q.   And what is your job right now, Ms. McGuire?

13    A.   I'm the manager of Professional Regulation Services.

14    Q.   At where?

15    A.   At the Oklahoma Bureau of Narcotics.

16    Q.   And what does that job title entail?

17    A.   So I oversee the registration division.  I also oversee

18    the prescription monitoring program and registrant compliance.

19    Q.   How long have you been with OBN?

20    A.   Since 2018.

21    Q.   And what's your educational background before that?

22    A.   So I have a Ph.D in Political Science and have worked at

23    the federal and municipal levels doing compliance and data

24    analysis.

25    Q.   Who needs an OBN registration?

JESSICA McGUIRE - DIRECT EXAMINATION BY MS. BAGWELL          294

1  A.   So OBN requires anybody who is manufacturing,

2  distributing, dispensing, prescribing, administering, basically

3  any business or person who is handling controlled substances.

4        MS. BAGWELL:  Brandi, can we pull up the statutory

5  language as a demonstrative?

6  Q.   (BY MR. BAGWELL) Do you recognize what's on the screen?

7  A.   Yes.

8  Q.   And what is that?

9  A.   So this is statute -- Oklahoma Statute, Title 63 2-302,

10 which is the law governing the registration requirements.

11 Q.   And have there been any substantive changes to this

12 statute between 2018 and 2023?

13 A.   No.

14 Q.   Looking at Section A, does this cover who needs an OBN

15 registration?

16 A.   Yes.

17 Q.   And who all is included in this first part?

18 A.   So it says "every person."  And we define "person" as

19 individuals and entities, businesses, corporations, anything

20 like that.  So any person who is "manufacturing," which would

21 be pharmaceutical manufacturers, or any CDS, like marijuana

22 growers, processors, anybody who is "distributing," so selling.

23 "Dispensing" would be giving to the patients.  Prescribing,

24 administering, using for scientific purposes and also anybody

25 who is going to be proposing to engage in those activities.  So

1  you have to have a registration prior to even becoming engaged

2  in that.

3  Q.   And how long has this been in effect?

4  A.   So this particular statute, the exact wording, I don't

5  know how long has been in effect, but I know that we became an

6  independent agency in 1975 and have been registering persons to

7  do CDS stuff since then.

8  Q.   So at least since 1975?

9  A.   Correct.

10          MS. BAGWELL:  Brandi, can we scroll down to Section

11  H?

12  Q.   (BY MS. BAGWELL) So this section right here:  "The

13  following person shall not be required to register and may

14  lawfully possess controlled dangerous substances."  Who does

15  that generally apply to?

16  A.   So that's going to be employees of registrants.  It's

17  going to be, like, a mailman, if he's delivering your

18  controlled substances that you ordered online; a nurse that's

19  going to be handing you the pills that were issued by the

20  doctor who is our registrant; law enforcement agents that seize

21  controlled substances as part of their duties.  It's mostly

22  going to be employees of registrants or people who are allowed

23  to lawfully possess the CDS as part of their jobs.

24  Q.   And how does this, this "lawfully possess," differ from

25  Section A as far as what someone can do with the controlled

1  substance?

2  A.   So when you are lawfully possessing it, it's at the

3  direction of a registrant.  So you can handle the CDS, you can

4  -- like a pharmacist can hand over the pills.  The pharmacy is

5  our registrant and the pharmacist is acting on behalf of and at

6  the direction of the pharmacy, the registrant.  And so a nurse

7  would hand over the pills in the hospital on the direction of

8  the registrant, who is the doctor.  So the doctor still has all

9  of the control as the registrant and is directing the

10 possession of.

11 Q.   And is that under this Section 1, the agent?

12 A.   Correct, yes.

13 Q.   Now, the "lawfully possess," can someone under this

14 section, can they manufacture a controlled substance?

15 A.   No.

16 Q.   And what about --

17        MR. GOLDSTEIN:  Your Honor, I'm going to object at

18 this point.  You know, she's not a legal expert.  She's not

19 even a lawyer.  And she's trying to describe to the Court what

20 a statute means.  I've let it go on for a little bit, but I

21 don't think she should be interpreting the statute for the

22 Court.

23        THE COURT:  All right.  Overruled.  Go ahead.

24 Q.   (BY MS. BAGWELL) What about Section 3?

25 A.   So this is kind of similar to what I was talking about,

 1  like, the mail person, common carriers and employees thereof.

 2  So we have mail-order pharmacies that will have UPS or FedEx

 3  deliver.  FedEx and UPS don't have to have registrations

 4  because they're not actually taking possession of -- or they're

 5  not taking, like, legal possession and authority of to then be

 6  the one distributing.  They're doing it based on the directions

 7  of the registrant.

 8  Q.   And anyone under Section H, basically the extent of their

 9  authority, is that to lawfully possess and nothing else?

10  A.   Correct.

11       MS. BAGWELL:  Brandi, we can take that down.

12  Q.   (BY MS. BAGWELL) As part of your job, do you process the

13  applications that come in for registration?

14       THE COURT:  Before you go on from there, is there

15  something in the statute about the consequence of the

16  violation?

17       THE WITNESS:  So if anybody is operating or doing any

18  of those registered activities without a registration, then it

19  is a criminal violation, it's just criminal distribution or

20  criminal manufacturing.  And that's also in the statute.

21       THE COURT:  And where is that?  Do you have that?

22       THE WITNESS:  I believe it's 63 2-406, I believe.

23       MS. BAGWELL:  Your Honor, I don't think we have that

24  section of the code pulled up, but we can certainly provide it

25  to the Court.

JESSICA McGUIRE - DIRECT EXAMINATION BY MS. BAGWELL          298

```
 1            THE COURT:  That's all right.  Go ahead.
 2  Q.   (BY MS. BAGWELL) As part of your job, do you process the
 3  applications that come in for registrations?
 4  A.   Yes.
 5  Q.   And how many people are in the registration department in
 6  general?
 7  A.   So we typically have three full-time individuals who are
 8  processing applications on a daily basis.
 9  Q.   And how many applications, excluding marijuana
10  applications, do you generally receive on a weekly/monthly
11  basis?
12  A.   So monthly, we're probably talking about, on average --
13  obviously, it fluctuates throughout the year, but about a
14  hundred, on average, per month.
15  Q.   When you include the medical marijuana registrations, how
16  does that number change?
17  A.   So at the height -- it's kind of slowed down recently
18  because of the moratorium at the OMMA, but at the height of it,
19  we had over 300 medical marijuana applications a week.
20  Q.   And are you or is anyone in the registration department a
21  trained investigator?
22  A.   No.
23  Q.   Can you explain how you review these documents and what
24  you're looking for?
25  A.   So in the registration division, we are -- or my staff is
```

1  responsible for reviewing completeness of the applications,

2  that everything is filled out, that everything matches the

3  licensing board.  So if it's a doctor, it has to match the

4  medical board.  If it's marijuana, it has to match the Oklahoma

5  Medical Marijuana Authority; they're the equivalent of a

6  licensing authority.  So we make sure everything matches, that

7  everything is complete and that they certify that everything

8  included in it is correct and accurate and we rely on the

9  information they provide to us to be true and accurate

10  information.

11  Q.   So let's go back to that.  You, because you're not an

12  investigator, solely have to rely on the information given to

13  you?

14  A.   Correct.

15  Q.   And do you personally review all of these applications?

16  A.   No.

17  Q.   Can you explain that process?  When do you personally

18  review them?

19  A.   So the registration staff, whenever they're seeing

20  something that is incomplete or is kind of a red flag -- so if

21  an application comes in and they've had previous discipline

22  from the licensing board, it gets escalated to me to review if

23  they can be processed or if it needs to go to legal.

24       Also, as time went on, it started getting escalated to me

25  when we started seeing odd patterns in applications that were

1   being submitted to us that seemed like there could be potential

2   problems with the application.

3   Q.   Now, what's the ultimate goal of this process for OBN?

4   A.   So the ultimate goal of issuing -- of us issuing a

5   registration is to ensure that people are given a registration

6   to lawfully conduct activities with CDS to protect public

7   health and safety.

8   Q.   If they have a registration, does that automatically mean

9   that they are in compliance with Oklahoma law?

10  A.   No.

11  Q.   Can you explain that?

12  A.   So the OBN registration, it's -- in particular with

13  marijuana, is the first step that allows them to begin

14  conducting business with CDS.  And then there is a whole, like,

15  potential -- well, there's a whole 475 and then there's --

16  which is our administrative code, and then you also have OMMA's

17  administrative code, as well, that marijuana has to follow.

18  Just having the piece of paper just authorizes you, kind of

19  like a driver's license authorizes you to drive a vehicle, but

20  you have to then follow all of the traffic laws.

21  Q.   Okay.  And are there -- so you mention the admin code.  Is

22  there admin code and then also a criminal code that governs

23  registrants?

24  A.   Yes.

25  Q.   What is that admin code's title?

JESSICA McGUIRE - DIRECT EXAMINATION BY MS. BAGWELL          301

1   A.   So it's Administrative Code 475 at the Oklahoma Bureau of

2   Narcotics.

3   Q.   And, now, the statute that we looked at earlier, you

4   stated there hadn't been any substantive changes from 2018 to

5   2023.  Were there any changes to the admin code?

6   A.   Yes.

7   Q.   And what were those?

8   A.   So when medical marijuana became a registered activity in

9   2018, we had to go through and we changed the security

10  requirements for marijuana because pharmaceuticals, for

11  instance, are mostly pills or liquids and stuff, and so there

12  are a lot of different rules and regulations that surrounded

13  the pharmaceutical industry that would not work for plants

14  growing in the ground.  You can't take plants up at the end of

15  the day and put them in a vault every night.

16       So there were a lot of different exemptions, and we

17  actually loosened our regulations when it came to security

18  requirements.  We also adopted the same standards that the

19  Medical Marijuana Authority had for recordkeeping, inventory,

20  just so then that way it would actually be easier to comply

21  with Oklahoma rules so that you didn't have to follow two

22  different sets of guidances when it came to a lot of it.

23       So those were -- recordkeeping, inventory, and security

24  are the only requirements that actually changed, and we made

25  them easier to comply with.

1  Q.   Okay.  Now, how does OBN differ from something like a

2  state licensing board or even the Oklahoma Medical Marijuana

3  Authority?

4  A.   So the licensing authorities are looking at patient care,

5  they're looking at the -- especially like doctors and things,

6  they're looking more about the patient relationship, patient

7  care, ethics.  And same with Medical Marijuana Authority,

8  they're looking at -- because they have the patient care as

9  well, they're looking at product quality, they're looking at

10 patients, they're looking at the different labeling

11 requirements and packaging requirements, whereas OBN is looking

12 at public safety, reducing the amount of drugs that are

13 misused, abused, diverted, sold on the black market.  We're

14 really a public safety and security agency.

15 Q.   Okay.  At the state level, is OBN the ultimate check on

16 overuse and misuse of drugs?

17 A.   Yes.

18 Q.   And, now, let's talk about marijuana at a high level for a

19 second.  After State Question 788, was marijuana still a

20 controlled substance federally?

21 A.   Yes.

22 Q.   Was it still a controlled substance at the state level?

23 A.   Yes.

24 Q.   How do the schedules for federal-controlled substances and

25 state-controlled substances overlap in this instance?

1  A.   So medical marijuana is a Schedule I drug at both the

2  federal and state level, that has not changed.

3  Q.   And what does that mean?

4  A.   So Schedule I drugs are listed that way because they're

5  determined to be the highest rate of abuse, misuse, and

6  considered more addictive, and so they're scheduled at a higher

7  or lower number but higher restrictions, more restrictions on

8  them because of that.

9  Q.   Now, for marijuana, does that registration process

10 overall, including the OMMA side, work slightly differently

11 than for, say, a pharmacy?

12 A.   Yes.

13 Q.   Can you explain how?

14 A.   So the medical marijuana applications with us, we actually

15 have 100 percent ownership disclosure required by statute, that

16 all ownership be disclosed and there are certain ownership

17 requirements when it comes to who can own a medical marijuana

18 business; whereas, pharmacy, they have ownership disclosure as

19 well, but it's not restricted to residency requirements or

20 anything like that.  It can be -- and that's at the Pharmacy

21 Board level of who regulates the ownership of pharmacies.

22      We also have to where the Pharmacy Board conducts

23 inspections and backgrounds of all of the pharmacists, whereas

24 we are -- OBN is the one that conducts the backgrounds of the

25 marijuana owners.

1  Q.    And what are those ownership restrictions for medical

2  marijuana?

3  A.    So it was originally 100 percent Oklahoma ownership of

4  marijuana businesses and then short -- really shortly after, in

5  2019, it changed to where 75 percent of the business had to be

6  owned by Oklahoma residents.  And the "beneficial owner" is how

7  they classify it, as beneficial owners.

8  Q.    Now.

9          THE COURT:  Is that by statute or by regulation?

10         THE WITNESS:  It's in statute, sir.

11  Q.    (BY MS. BAGWELL) So do they first go to OMMA and get their

12  license?

13  A.    Yes.

14  Q.    And then they come to you guys and apply for registration?

15  A.    Correct.  Yes.

16  Q.    And then once they receive the registration, is that the

17  first time they're authorized to start operating?

18  A.    Yes.

19         MS. BAGWELL:  Brandi, can we pull up Exhibit 2?

20  Q.    (BY MS. BAGWELL) Do you recognize generally what this

21  document is?

22  A.    Yes.

23  Q.    And can we -- and what is it?

24  A.    So this is an application that was submitted to the

25  Oklahoma Bureau of Narcotics for medical marijuana manufacture.

JESSICA McGUIRE - DIRECT EXAMINATION BY MS. BAGWELL          305

1   Q.   Is this the type of application that you and your staff

2   would be reviewing in order to determine if someone should get

3   a registration?

4   A.   Yes.

5          MS. BAGWELL:  Brandi, can we go to page 5, please?

6   Q.   (BY MS. BAGWELL) So what is this box?

7   A.   So this is the owners of the medical marijuana grow.  It

8   shows that Helen Carrillo is the 75 percent owner and Zhao Yang

9   is the 25 percent owner.

10  Q.   Now, assuming that Helen Carrillo is an Oklahoma resident

11  and is actually -- owned 75 percent of the business, is this

12  accurate?

13  A.   Yes.

14  Q.   And if Helen Carrillo is either not an Oklahoma resident

15  or does not own 75 percent of the business, is it false

16  information?

17  A.   Yes.

18         MS. BAGWELL:  Brandi, can we go to page 16?

19  Q.   (BY MS. BAGWELL) So who is the contact on this?

20  A.   So it says Zhao Yang is the contact.  First name and last

21  name with the contact email is matt@stacylegalgroup.com.

22         MS. BAGWELL:  Can we go to page 17 now, Brandi?

23  Q.   (BY MS. BAGWELL) So what is this right here?

24  A.   So this is the -- since we require the ownership to be

25  disclosed to us, this is the -- one of the owners.  This is

1  Helen Carrillo's information as an owner of this business.

2  Q.    Does this differ in terms of who can put their information

3  in the contact person?

4  A.    Yes.

5  Q.    How so?

6  A.    So the contact person is typically someone on site that's

7  like a manager or like a pharmacist in charge, if it's a

8  pharmacy, whereas this information is the actual owner.  And so

9  it's going to have -- we need the owner's information, the

10  owner's address, the owner's cell phone, the owner's email, the

11  owner's Social Security number, driver's license because we

12  also do -- since we do background checks on all owners, we

13  actually pull up the owner with the Social Security number or

14  their driver's license, and then we verify all of the

15  information and look at their criminal history.  So we have to

16  have the -- all of this has to be owner's record.

17  Q.    Okay.  And why is it important, not just for background

18  check purposes but moving forward, to have the accurate

19  information for the owner themselves?

20  A.    So we -- because the owners are the ones that are

21  responsible with ensuring that their business complies with all

22  of the rules and regulations and statutes, we need to be able

23  to contact the owner of the business if something goes wrong,

24  if there is a fire or a burglary or robbery or if there's some

25  type of diversion going on, we need to be able to contact the

1  owner.  If we're on site needing to get inside to do an

2  inspection, we need to be able to contact the owner for them to

3  let us in.  If we have questions about the registration itself

4  or we have questions for the business, the owner is going to be

5  the one responsible for knowing all the rules and regulations

6  and complying with them.

7  Q.   So this email and this phone number, do you know who they

8  belong to?

9  A.   Yes.  That is -- the email is Matt Stacy's email and the

10  cell phone number -- I'm not sure if it's a cell phone or if

11  it's a business phone number, but it's also Matt Stacy's phone

12  number.

13  Q.   So not Helen Carrillo's information?

14  A.   Correct.  Not hers.

15  Q.   Is that an acceptable practice?

16  A.   No.

17  Q.   Is that false information?

18  A.   Yes.

19       MS. BAGWELL:  Can we go to page 20, please?

20  Q.   (BY MS. BAGWELL) Now, is this the 25 percent owner's name

21  listed?

22  A.   Yes.

23  Q.   And whose email is listed?

24  A.   Again, it's the Matt Stacy, it's matt@stacylegalgroup, and

25  the cell phone number is the same cell phone number as Helen

1   Carrillo's.

2   Q.   Is that an acceptable practice?

3   A.   No.

4   Q.   Is that false information?

5   A.   Yes.

6   Q.   Based on the information provided in here, if something

7   had gone wrong at this grow, would you have been able to

8   contact either of the owners that were responsible and liable

9   for that grow?

10  A.   No.

11        MS. BAGWELL:  Can we go to Exhibit 4, please, Brandi?

12  Q.   (BY MS. BAGWELL) So this looks like -- what is this?

13  A.   Yeah, so this is another application.  So this is -- so we

14  actually had -- when medical marijuana first started, we were

15  in a -- we had a different software vendor that accepted our

16  applications, but it's the exact same data requirements, it

17  just looks a different format, basically.

18  Q.   So where it says "registrant information," is that the

19  same as the section for owner information that we saw in the

20  other?

21  A.   Yes.  Yeah, it's included in the same.

22  Q.   What's the business name for this one?

23  A.   CX Green LLC.

24  Q.   And who is the contact person on this?

25  A.   Matt Stacy.

1  Q.   Now, this email address that's listed, is that supposed to

2  belong to the contact person or to the registrant?

3  A.   To the registrant.

4  Q.   And whose email is that?

5  A.   Matt Stacy's.

6  Q.   The phone number?

7  A.   That is supposed to be the business phone number for the

8  business, but that is Matt Stacy's phone number.

9  Q.   So if Matt Stacy is not the owner, are these two -- the

10 email and phone number -- false information?

11 A.   Yes.

12        MS. BAGWELL:  Can we go to page 3, please, Brandi?

13 Q.   (BY MS. BAGWELL) Who is the owner of this -- or listed

14 owner of this business?

15 A.   Crystal H-U-Y-N-H.  I think it's Huynh.

16 Q.   So whose information should have been listed for the phone

17 number and the email?

18 A.   Hers.

19 Q.   Is it an acceptable practice to list someone else's phone

20 number?

21 A.   No.

22 Q.   Is it false information?

23 A.   Yes.

24 Q.   Same with email?

25 A.   Yes.

1         MS. BAGWELL:  Can we go to Exhibit 6, please, Brandi?

2    Can we go to page 2?

3    Q.    (BY MS. BAGWELL) So what are we looking at here?

4    A.    So this is a registration that Kylie Kennedy owned and so

5    this is her information as the owner of a marijuana business.

6    Q.    Okay.  So right here, if Kylie Kennedy didn't actually own

7    that business, is that false information?

8    A.    Yes.

9    Q.    If that's not Kylie Kennedy's email, is that false

10   information?

11   A.    Yes.

12   Q.    If that email doesn't belong to the owner, is it false

13   information?

14   A.    Yes.

15        MS. BAGWELL:  Can we go to --

16   Q.    (BY MS. BAGWELL) Did OBN, to your knowledge, ever tell

17   Matt Stacy that he could put his information as owner

18   information?

19   A.    To my knowledge, no, that did not happen.

20        MS. BAGWELL:  Brandi, can we blow up the spreadsheet?

21   Q.    (BY MS. BAGWELL) So we've looked at a couple of examples.

22   Were these the only times Matt Stacy did this?

23   A.    No.

24   Q.    And as a demonstrative, did you create a spreadsheet of

25   every application that Matt Stacy was connected to?

1    A.    Yes.

2    Q.    And is this that spreadsheet?

3    A.    Yes.

4    Q.    What are these highlighted portions?

5    A.    So these are grows that were Helen Carrillo, Kylie

6    Kennedy, and Bay Tran applications that had them as 75 percent

7    owners and were submitted in June, July, August of 2020.

8    Q.    And now those three people, are those all people that OBN

9    has confirmed were not actual owners in these grows?

10   A.    Yes.

11   Q.    How many total applications did Matt Stacy submit?

12   A.    Like, with or -- like, all in general regardless of --

13   Q.    All in general?

14   A.    Over 300.

15   Q.    Okay.

16         MS. BAGWELL:  Can we scroll slowly, Brandi?

17   Q.    (BY MS. BAGWELL)  Does that include -- from the start of

18   this, is every single one of these highlighted one's Bay Tran,

19   Kylie Kennedy, or Helen Carrillo?

20   A.    Yes.

21         MS. BAGWELL:  Can we stop here, Brandi?  Can we go up

22   just a little bit.  Go up to about -- the date on it should be

23   about 5/20.

24   Q.    (BY MS. BAGWELL) So on 5 -- are you aware that Mr. Stacy

25   had a meeting with OBN on May 21st?

1    A.    Yes.

2    Q.    Are you aware he had had previous conversations in early

3    May with them?

4    A.    Yes.

5    Q.    Were these all submitted after that date?

6    A.    Yes.

7          MS. BAGWELL:  Can we keep scrolling, Brandi?

8    Q.    (BY MS. BAGWELL) And what's the end date on this?

9    A.    October 23, 2023.

10   Q.    Now, the ones that we had highlighted, are those the only

11   possible straw owners submitted or just the ones that have been

12   confirmed?

13   A.    Those are only the ones that have been confirmed.

14         MS. BAGWELL:  May I have one moment, Your Honor?

15   Q.    (BY MS. BAGWELL)  Ms. McGuire, did Stacy himself submit

16   all of these applications?

17   A.    As far as I know, from the information we have, yes, it's

18   Matt Stacy's profile and login.

19   Q.    Can you explain that -- how that works?

20   A.    So all of our information is electronic.  So whenever

21   you're trying to submit an application, you actually have to

22   create a profile with a username, password, and then you also

23   have a profile that asks you your first name, last name, date

24   of birth, your address, your phone number.  And then after you

25   create the profile, it gives you access to all of the

1   applications and any renewals that you submit, any businesses

2   that you represent or own.  And so on all of these

3   applications, it's all on the profile that's first name is Matt

4   and last name is Stacy.

5   Q.   So at the very least, would someone have had to have that

6   login information in order to submit these applications?

7   A.   Yes.  Either it was him or he gave his password to someone

8   else to do it on behalf (sic).

9          MS. BAGWELL:  No further questions.

10          THE COURT:  Cross-examine.

11          MR. GOLDSTEIN:  Thank you, Your Honor.

12                       CROSS-EXAMINATION

13   BY MR. GOLDSTEIN:

14   Q.   Ms. McGuire, good morning.

15   A.   Good morning.

16   Q.   Where do I find in the statutes or regulations the

17   definition of a straw owner?

18   A.   So the definition of a straw owner, I believe, is in

19   2-101, 63 2-101.

20   Q.   And when was that added?

21   A.   I believe the definition was added in '23 or '24.  I don't

22   remember the exact date.

23   Q.   Right.  Didn't exist in '19, '20, '21, or '22, correct?

24   A.   The definition did not.

25   Q.   Right.  And what statute do I go to that tells me, as a

1  lawyer in Oklahoma, that a business can't use their attorney's

2  email or attorney's phone number as their contact?

3  A.   As the contact for what?

4  Q.   On an application to OBN.  What statute do I go to to find

5  that language, as a lawyer, so that I know that I'm not allowed

6  to use my phone number and my email for my client business

7  owner under the business owner details?  The applications you

8  just went through, what statute says that?

9  A.   So there's no statute that says that particular, like,

10 exact verbiage, but there is a statute that says providing

11 false or fraudulent information or omitting information from an

12 application is not allowed.

13 Q.   Right.  But there's no statute that says a business can't

14 designate their lawyer's phone number as their business phone

15 number with OBN, there's no statute that specifically says

16 that.

17 A.   It doesn't say it can't be the contact person, but it --

18 that cell phone number is not the owner.

19 Q.   Not just the contact person.  Not just the contact person.

20 There is no statute, there is no rule, there is no regulation

21 that prohibits a business owner from designating their lawyer's

22 email as their email with OBN, correct?

23 A.   That would be false information.

24 Q.   We'll get to that.  I'm just asking if there's a statute

25 that prohibits it.

1   A.   We argue that -- yes, we argue that 304 is a statute that

2   says that information is false information.

3   Q.   304 says a client can't put their lawyer's email on an

4   application?

5   A.   No.  It says that providing false information is not

6   allowed and that's not the owner's phone number or email.

7   Q.   Okay.  And would you never knowingly approve a false

8   application, right?

9   A.   Correct.

10  Q.   Would never do that, right?

11  A.   Correct.

12  Q.   Okay.

13          MR. GOLDSTEIN:  May I have the document camera,

14  please?

15  Q.   (BY MR. GOLDSTEIN) Ms. McGuire, you would email on a

16  weekly basis with Mr. Stacy and his employees within his

17  office, correct?

18  A.   I don't believe that's correct.

19  Q.   That's your email address, correct?

20  A.   Yes.

21  Q.   December 1, 2020?

22  A.   Yes.

23  Q.   You're emailing with Mr. Stacy, right?

24  A.   Yes.

25  Q.   Matt Stacy's email is right there, correct?

 1   A.   Yes.

 2   Q.   His business phone is on the signature line of Ms. Goure,

 3   correct?

 4   A.   Yes.

 5   Q.   Exhibit 32, February 28, 2021, Matt Stacy again emailing

 6   with your team, correct?

 7   A.   Yes.

 8   Q.   His email address, right?

 9   A.   Uh-huh.  Yes.

10   Q.   That phone number that you just had on the applications is

11   listed right here in the signature line, right?

12   A.   Yes.

13   Q.   Exhibit 33, March 1st, Mr. Stacy's signature line, both of

14   his phone numbers, correct?

15   A.   Yes.

16   Q.   Matt Stacy's email address, correct?

17   A.   Yes.

18   Q.   Exhibit 50, March 4th, Mr. Stacy's email address, right?

19   A.   Yes.

20   Q.   His phone number, right?  Those same numbers that are on

21   the application, right?

22   A.   Yes.

23   Q.   The same email that's on the applications, right?

24   A.   Yes.

25   Q.   Exhibit 36.  Once again, Mr. Stacy's email, right, April?

1    A.    Yes.

2    Q.    Phone number, right there on the signature line, right?

3    A.    Uh-huh.  Yes.

4    Q.    July 9, Mr. Stacy's Stacy Legal Group, address, phone

5    number, right?

6    A.    Yes.

7              THE COURT:  Rather than go through all of those, why

8    don't you represent to her how many there are?

9    Q.    (BY MR. GOLDSTEIN) You knew Mr. Stacy's email address,

10   right?

11   A.    No.

12   Q.    You didn't know it?

13   A.    I mean, I wouldn't have been able to tell you off the top

14   of my head that it was matt@stacylegalgroup.com.  I even had to

15   look it up the other day to see if it was .net or .com or what.

16   But I also was not the one processing applications every day.

17   These would get escalated to me if I (sic) needed to.  But

18   whenever I look at emails, I'm not looking at where -- like,

19   what was your actual domain name or anything like, that I'm

20   reading the body of it, I'm not investigating your emails to

21   see your structuring.

22   Q.    You have a Ph.D., right?

23   A.    Yes.

24   Q.    All right.  You're telling me that here is an email from

25   you, August 5th of 2021, you're going to tell this Court under

1  oath that you did not realize matt@stacylegalgroup.com was

2  Mr. Stacy's email address?

3  A.   No, that's not what I said.

4  Q.   What did you say?

5  A.   I said that I didn't know off the top -- like, I'm not

6  going to be able to say off the top of my head that every

7  single application had that exact email.  I didn't look at

8  every single application that came in.

9  Q.   It's your job, you and your team's job -- you don't

10 consider yourself customer service, right?

11 A.   Yes.  Not me, not myself, but my staff, yes.

12 Q.   All right.  And the application comes in and your --

13 you're the front lines to review an email -- an application,

14 right?

15 A.   Yes.

16 Q.   You're seeing these applications come in.  You've approved

17 -- you and your team have approved -- you said there were 300

18 applications filed by Mr. Stacy, right?

19 A.   Over time, yes.

20 Q.   You have approved hundreds of Mr. Stacy's applications

21 with that email address and those phone numbers, correct?

22 A.   I don't know that.  I don't know if all -- because not all

23 of them had his phone number and email address as the owner's

24 phone number and email, so I wouldn't be able to say

25 affirmatively if there were hundreds.

JESSICA McGUIRE - CROSS-EXAMINATION BY MR. GOLDSTEIN          319

1  Q.   You have approved applications with that email address and

2  phone number, right?

3  A.   Yes.

4  Q.   All right.  You have Mr. Stacy's email.  You personally

5  are emailing with Mr. Stacy, right?

6  A.   Yes.

7  Q.   Your team is personally emailing with Mr. Stacy and

8  Ms. Goure and Siyan on a weekly or biweekly basis, right?

9  A.   At times, yes.

10 Q.   They're asking you questions, you're giving answers,

11 right?

12 A.   Yes.

13 Q.   Did you ever once tell Mr. Stacy, Ms. Goure, Ms. Baker

14 that it was false, improper, to put their contact information

15 under the business owner?

16 A.   I personally did not have that conversation.  I don't know

17 if anybody else did.

18 Q.   Well, do you know of anyone else having that conversation?

19 A.   Again, like I said, I don't know if anybody else has.

20 Q.   Right.  So if it was so false and so improper and so

21 critical to your job function, why didn't you simply tell

22 Mr. Stacy you can't put your email under business owner?

23 A.   We rely on the registrant to give us correct information.

24 And maybe Helen Carrillo does have access to his.  At the time,

25 we wouldn't have known if she had access to

1  matt@stacylegalgroup or his cell phone, like when we were first

2  initially seeing them.

3  Q.    Did you have that conversation internally?

4  A.    I mean, I -- it was 2020, I don't necessarily recall if

5  that exact conversation happened, but how investigations work

6  is you can't make decisions on an application on a whim or on a

7  gut feeling, you have to actually prove that that information

8  is, and so we would recommend it to an agent to look into it

9  further.  It's one of those things where our system was not

10  designed to detect fraud or detect when people are being

11  dishonest, our system relies on the honesty of our registrants.

12  And that's what we were relying on as well.  So once we saw a

13  pattern, we started referring them out to agents to look at it

14  further.  That's what registration does.

15  Q.    Well, you saw a pattern of Mr. Stacy's email address,

16  right?

17  A.    Correct.

18  Q.    You never said a word to him he couldn't do it, right?

19  A.    I did not.

20  Q.    Okay.  Now, on the subject of false and misleading

21  application materials, I'm going to show you Government Exhibit

22  6 that the government went over with you.  Okay?

23        This is an application that was submitted to OBN, correct?

24  A.    Yes.

25  Q.    H Green?

1  A.  Yes.

2  Q.  Okay.  This is similar to applications that you relied on

3  before the state judge at the preliminary hearing, right?

4  A.  Yes.

5  Q.  This language right here that you just submitted to the

6  Court as an application filed by Mr. Stacy has certain

7  affirmation language on it, right?

8  A.  Yes.

9  Q.  That language was not on the application Mr. Stacy filed,

10  was it?

11  A.  I wouldn't -- I can't answer that just by the information

12  that you provided to me.

13  Q.  Well, let's do this:  What's the date on that application

14  right there, Exhibit 2?

15  A.  So that's December 11, 2020.

16  Q.  The same affirmation appears on this document, right?

17  A.  Yes.

18  Q.  Testified under oath at the preliminary hearing in the

19  state.  This language was not added until July 2021 or the fall

20  of 2021; do you recall that testimony?

21  A.  Yes.

22  Q.  All right.  So this document that you just went over with

23  the government, submitted to this Court as Mr. Stacy's

24  application, has information on here that wasn't on the actual

25  application, right?

1  A.   Well, these are two different submissions, but -- and the

2  one you showed earlier is a different registrant.  But the

3  first page that you showed is the different system and so it

4  kind of depends on when the application was submitted.  This

5  one you're showing right now, this exact one right here, did

6  not have that.  The other one you showed before you switched

7  registrants did have that question on the application because

8  she answered true -- that's true that she is not.  So you're

9  showing two different businesses is what I'm saying.

10 Q.   This -- the first one I showed you has a date of July 3,

11 2021?

12 A.   Correct.

13 Q.   Are you telling me -- are you swearing under oath right

14 now -- okay, are you swearing under oath that this Exhibit 6

15 had this affirmation language in it when Mr. Stacy's office

16 filed it; yes or no?

17 A.   So this -- I mean, again, what you're showing me I don't

18 have the complete picture of what registration -- because those

19 are two different registrations.

20         MR. GOLDSTEIN:  May I approach, Your Honor?

21         THE COURT:  I'm kind of lost here.  Why don't you

22 explain it what you're getting at.

23         MR. GOLDSTEIN:  Yeah.  So in the state court they

24 relied on these applications, like this application right here,

25 okay, that was filed by Mr. Stacy December of 2020.  Okay?

1  Their systems changed over many times, Your Honor, different

2  iterations.  This language that they have on here, where

3  they're supposedly swearing under oath, making certain

4  representations to OBN, was not on the application that was

5  filed.  This has been transposed later on when they printed

6  this document from their system.  This is not the original

7  application that was filed.

8          THE COURT:  I understand what you're saying.  Go

9  ahead.

10          THE WITNESS:  So what I will say is Government

11  Exhibit 2, the front page here is the original application that

12  was filed.  And then when you keep turning you can see that

13  it's -- not so far you -- can see what the application -- where

14  the system changes.  So this one -- 2 and 6 are two

15  completely -- you're asking two different things.  That

16  question right there was not on the original application for

17  Government Exhibit 2 because that's why you have the other

18  application type.  That question absolutely was on Government

19  Exhibit 6 application.

20  Q.   (BY MR. GOLDSTEIN)  Okay.

21  A.   Original application.  It was on this one.  That's why I

22  wanted to make sure we weren't saying two different things.

23  Q.   How do you know that?

24  A.   Well, that application was submitted -- the one in your

25  hand was submitted, you can see on the front page -- or the

JESSICA McGUIRE - CROSS-EXAMINATION BY MR. GOLDSTEIN          324

1  second page, I believe, you can see it was submitted July -- I

2  can't see it anymore, but --

3          MR. GOLDSTEIN:  May I approach, Your Honor?

4          THE WITNESS:  Sorry.  So this application was

5  submitted in July of 2021.

6  Q.  (BY MR. GOLDSTEIN)  What date?

7  A.  Well, it was issued July 6 of '21.

8  Q.  So what -- whoa, whoa --

9  A.  Hang on.  Let me get you the exact date on here.  It looks

10 like it's July of 2021, maybe --

11 Q.  What date?

12 A.  It looks like it's potentially July 3rd, but --

13 Q.  How do you know it's submitted July 3rd?

14 A.  Well, it says "created date" on here is July 3rd, but --

15 Q.  That means it would have been submitted -- that means it

16 would have been submitted before July 3rd?

17 A.  Potentially.

18 Q.  Right.

19 A.  Potentially.

20     However, you can see when this was -- this application was

21 submitted to us, the difference between 2 and 6 is that they

22 answered true on this, which means they did answer it on the

23 application and then on 2 -- Exhibit 2, it's blank, there is no

24 answer; so you can see that it never was filled out.  That was

25 not a question at the time.

1  Q.   So to be very clear, because I want your testimony to be

2  very clear, you are saying, under oath, that Exhibit 6, okay,

3  had that certification language on it and there's no doubt in

4  your mind that that certification language was on this

5  application?

6  A.   It's on that particular one, yes.

7  Q.   No doubt?

8  A.   On that Government Exhibit 6, you can see that the

9  question is there and it is answered.

10 Q.   Could your system have inputted the information at the

11 end?

12 A.   No.

13 Q.   Impossible?

14 A.   It's -- so as you can see on Government Exhibit 2, there's

15 no answer.

16 Q.   I understand what's on 2.  I'm asking you, is it possible

17 that your system -- you changed systems right at this time,

18 July of 2021 --

19 A.   Yes.

20 Q.   -- right?

21      You went to a new system, right?

22 A.   Correct.

23 Q.   And so applications submitted in June were held up and

24 were received by you and processed by you after the

25 registration system changed, which was in early July, right?

1  A.   Correct.

2  Q.   You don't even know the date that this was submitted to

3  your office.  You can't tell, right?

4  A.   Correct.

5  Q.   Okay.  This is a transcript of your testimony at the

6  preliminary hearing in the state court.  Okay?

7  A.   Okay.

8  Q.   You were asked at page 1181:  The application made -- your

9  answer -- the application made a change to where in the owner

10  information, I believe that was 2021, our actual application we

11  put a question on there whether or not -- we put a statement on

12  there whether they certify that they're not a licensed holding

13  company, right?

14  A.   Yes.

15  Q.   And we're talking about this exact language, right?

16  A.   Yes.

17  Q.   You then testified at page 1183:  I do not know the exact

18  date, but it would have been after July.  It would have been

19  after July of 2021 at some point.  I don't remember the exact

20  date.  Fall of 2021.

21  A.   Yes, that's what I said.

22  Q.   That's your testimony in the state court under oath,

23  correct?

24  A.   Yes.

25  Q.   You've testified several times that you have to rely on

1  the information given to you by the applicants, right?

2  A.   Yes.

3  Q.   But that's not actually true because you have agents that

4  you can send out to speak to people, right?

5  A.   I mean, yes, they can -- we have agents that speak to

6  people.

7  Q.   Right.  Meaning, application comes into your system, you

8  review the information, and if there are questions about an

9  application, you're not just hamstrung, you have actual agents,

10 like Agent Martinez, who you can ask to go out and interview

11 the applicants, right?

12 A.   By calling them and making appointments on the information

13 provided to us.  I don't know how we would call the applicant

14 if all of the phone numbers go to someone who is not the

15 applicant.

16 Q.   How about just going out -- you have their address, right?

17 March 1, 2021, Agent Martinez went to Ms. Carrillo's home.

18 A.   Correct.  Well, I'm -- that's my understanding, yes.

19 Q.   The physical address and the home address and the licenses

20 of these people, you have that information.

21 A.   Yes.

22 Q.   Right.  So calling someone and emailing them isn't the

23 only way to get ahold of someone, right?

24 A.   Correct.

25 Q.   All right.  So you could have sent an agent, if you had

1  questions, out to see Ms. Carrillo or anyone else, right?

2  A.    Yes.

3  Q.    So you don't have to rely on the information.  You have

4  assets available to you, like law enforcement agents, who go

5  out as part of their job and talk to applicants, right?

6  A.    As a last resort, yes.  They shouldn't really be spending

7  a lot of their time trying to chase down applicants because

8  they're giving us wrong information.  They should be trying to

9  actually go out and deal with criminal, like, meth dealers and

10 things like that, instead of trying to chase down individuals.

11 Q.    Well, let's look at your supplemental application.

12 A.    Okay.

13 Q.    In sometime in 2023, I think -- you can take a look at

14 this.  This is Defendant's Exhibit 74.  Okay?

15 A.    Yes.

16 Q.    All right.  At some point -- was it 2023 that this was

17 issued?

18 A.    I'm trying to remember -- yes, that sounds -- well, I'm

19 trying to remember now if -- so it would have been --

20 Q.    Well, look --

21 A.    -- like January of 2023.

22 Q.    The document references spring of '22, so it was after the

23 spring of '22, right?

24 A.    Yes.  Yes.  I think it was, like, January of '23 or

25 December of '22 possibly.

1    Q.   Let's talk about the process that you eventually

2    implemented.

3    A.   Yes.

4    Q.   Okay.  Step one, applicant for a registration to

5    manufacture, cultivate marijuana, submits the application form,

6    right?

7    A.   Yes.

8    Q.   That goes to you, right?  Your team?

9    A.   Yes.

10   Q.   Step two, applicant will then download and complete a

11   supplemental application packet which contains requests for

12   additional documentation, right?

13   A.   Yes.

14   Q.   Step three, upon the timely return of the preceding

15   supplemental application, OBN will schedule a face-to-face

16   interview with all applicants on the application, right?

17   A.   Yes.

18   Q.   Step four, at the completion of the interview, OBN may

19   grant the registration or conduct a further criminal and/or

20   administrative investigation, right?

21   A.   Yes.

22   Q.   This is a responsible approach to the issuance of

23   registrations to people who want to be engaged in the

24   manufacturing and growing and processing of a controlled

25   substance, right?

1  A.    I would argue that, yes.

2  Q.    It's not an argument, you just agree with me, right?

3  A.    I don't think that we were doing anything irresponsibly

4  before.  This would never have worked when we were having 300

5  applications a week.

6  Q.    And whose fault is that?

7  A.    Well, I mean, I don't necessarily think there's a fault at

8  anybody, but just everybody was overwhelming the system trying

9  to, like, get the "green rush," as they were calling it.

10 Q.    Well, nobody prohibited you from implementing this process

11 on August 1st of 2018, right?

12 A.    No.

13 Q.    There was nothing prohibiting you from implementing this

14 process in 2020 or 2021, right?

15 A.    Correct.

16 Q.    You dictate what requirements are needed for an OBN

17 registration, meaning OBN, right?

18 A.    Yes.

19 Q.    You make the decision about what materials you want, what

20 materials you don't want, right?

21 A.    Yes.

22 Q.    And so eventually you went to this process sometime after

23 the spring of 2022 when you required things like an affidavit,

24 articles of incorporation, operating agreement, management

25 agreements, self-inspection assessments, owner and property

1  information form, site plans, all of these things, right?

2  A.  Yes.

3  Q.  Required an affidavit to be filled out that required all

4  sorts of attestations, right?

5  A.  Yes.

6  Q.  None of this existed in 2020 or 2021, right?

7  A.  The affidavit did not, no.

8  Q.  Well, this whole document didn't, right?

9  A.  Well, correct.  This exact document did not, no.

10  Q.  Okay.  And so that's where OBN eventually landed, right?

11  Like a professional, thorough application process, right?

12  A.  Again, I don't think that our professional -- our process

13  before was not professional, we just added more steps due to

14  the rampant amount of fraud and false information that was

15  being provided to us.  It was kind of a last resort to try to

16  stop it.

17  Q.  Let me show you document 105 very quickly.  This is an

18  email from Russ Cochran on June 30th of 2021.  The government

19  went through certain applications on certain dates with you.

20  This is a cover email from Russ Cochran, who was general

21  counsel at this time at OBN, right?

22  A.  Yes.

23  Q.  And this is a letter that he sent on June 30, 2021, right?

24  Do you see that?

25  A.  Yes.

1  Q.   The cover letter says:  Matt, please find the attached

2  letter with the businesses that we have officially denied,

3  right?

4  A.   Yes.

5          MR. GOLDSTEIN:  Your Honor, I'd like to admit one

6  additional exhibit through this witness that's not on our list.

7  It's Defense Exhibit 154.

8          THE COURT:  Any objection to 154?

9          MS. BAGWELL:  One moment.

10          MR. COFFEY:  One moment.  Because I haven't seen this

11  before, I don't think, Your Honor.

12          MS. BAGWELL:  No objection.

13          THE COURT:  154 will be admitted.

14          MR. GOLDSTEIN:  Thank you, Your Honor.

15  Q.   (BY MR. GOLDSTEIN) Defendant's Exhibit 154 is an email

16  string between Mr. Stacy and a woman by the name of Sierra

17  Pipher or Pfeiffer?  How do you pronounce that?

18  A.   We went back and forth, but I think she actually goes by

19  Pfeiffer.

20  Q.   Pfeiffer.  And she is a lawyer or at least was on February

21  23, 2022.  Do you see the date of that email?

22  A.   Yes.  At that time she was an attorney at OBN, yes.

23  Q.   She's no longer there?

24  A.   Correct.

25  Q.   I'm not going to go through the whole email, we can do

1  that later with the Court.  She writes:  With all the confusion

2  surrounding medical marijuana laws, we are making sure that all

3  of our positions are in writing; do you see that?

4  A.    Yes.

5  Q.    And that date is February of 2022, right?

6  A.    Yes.

7  Q.    Okay.  All right.  Now I want to talk to you about your

8  testimony as to the relevant statutes.

9        This is the statute you reviewed with the government,

10 right?

11 A.    Yes.

12 Q.    Okay.  Section 2032, right?

13 A.    Yes.

14 Q.    And you testified that this statute in paragraph A, right,

15 requires every person who manufactures, distributes, dispenses,

16 prescribes, administers or uses any controlled substance to get

17 a registration with OBN, right?

18 A.    Yes.

19 Q.    And you testified that there have been no substantive

20 changes to this statute since 2018, right?

21 A.    Correct.

22 Q.    So this paragraph is an introductory paragraph.  You don't

23 have any legal training, right?

24 A.    I did not go to law school.

25 Q.    Do you have other legal training?

1  A.   I mean, in political science we take a lot of legal

2  research and constitutional law and public law and things like

3  that as part of that degree.

4  Q.   So you don't know the canons of construction for statutes

5  or anything like that?  Are you an expert in that area?

6  A.   I mean, I wouldn't call myself an expert, necessarily,

7  but, yes, we learn that.  And part of what we do at OBN is

8  review policy and law all the time.

9  Q.   Can you tell me any canons of construction for statutes?

10  A.   I mean, not off the top of my head.

11  Q.   So this introductory paragraph is the general introduction

12  that anyone who wants to manufacture, distribute, or possess

13  needs an OBN registration, right?

14  A.   Correct.

15  Q.   Then there's an exception to this.  And that's -- I think

16  you went through this with the government -- subparagraph H,

17  right?

18  A.   Yes.

19  Q.   Subparagraph H says:  The following persons shall not be

20  required to register and may lawfully possess controlled

21  dangerous substances under the provisions of 201 (sic) et seq.

22  Of this title, right?

23  A.   Yes.

24  Q.   And the first entry is:  "An agent, or an employee

25  thereof, of any registered manufacturer, distributor, dispenser

1  or user," right?

2       So an agent of a registered manufacturer, distributor,

3  dispenser does not need to have a registration with OBN,

4  correct?

5  A.   Correct.

6  Q.   Okay.

7            MR. GOLDSTEIN:  May I have the document camera,

8  please?

9  Q.   (BY MR. GOLDSTEIN) I'm showing you the definition of

10  "agent" as it appears in the statute.  Okay?  An agent who is

11  excepted from the registration requirements, according to the

12  paragraph we just reviewed, right?

13  A.   Uh-huh, yes.

14  Q.   Means a peace officer appointed by and who acts on behalf

15  of the Director or an authorized person who acts on behalf of

16  or at the direction of a person who manufactures, distributes,

17  dispenses, prescribes, administers or uses for scientific

18  purposes but does not include a common contract carrier, public

19  warehouser or employee thereof or a person required to register

20  under the Dangerous Act.

21       Do you see that?

22  A.   Yes.

23  Q.   Okay.  So an agent who is excepted is an authorized person

24  who acts on behalf of or at the direction of another person,

25  right?

1    A.    Of a registrant, yes.

2    Q.    I'm showing you the definition of "person."  A person

3    means, amongst other things, a corporation, right?

4    A.    Correct.

5    Q.    I want to show you Administrative Code 475:10-1-9, do you

6    see that?

7    A.    Yes.

8    Q.    I'll go through this with the Court at some point, but you

9    see that there are -- in this particular code there is (a),

10   (b), (c), (d), and (e), right?

11   A.    Yes.

12   Q.    And what's the date effective there?  Do you see that in

13   the middle?

14   A.    Yes.

15   Q.    Effective July of '19 to August 2023, correct?

16   A.    Yes.

17   Q.    Now I want to show you the same section, which is

18   effective August 4, 2024, right?

19   A.    Yes.

20   Q.    There's a new paragraph, paragraph F, do you see that?

21   A.    Yes.

22   Q.    Says:  All medical marijuana applicants and registrants

23   and all medical facilities required to register under 2-302(c)

24   shall disclose to OBN all beneficial owners and all other

25   entities or natural persons that have an ownership interest in

1    the business.  Right?

2    A.    Yes.

3    Q.    Added in 2024, right?

4    A.    Yes.

5          MR. GOLDSTEIN:  I just need one moment, Your Honor.

6    One moment, Your Honor.  Thank you.

7    Nothing further, Your Honor.  Thank you.

8          THE COURT:  Further questions?

9          MS. BAGWELL:  Briefly, Your Honor.

10         MS. BAGWELL:  Brandi, can we pull up that Section H

11   again?

12                     REDIRECT EXAMINATION

13   BY MS. BAGWELL:

14   Q.    Ms. McGuire, I just want to clear something up.  So

15   Section H:  The following person shall not be required to

16   register and may lawfully possess.  And under that is an agent

17   as an option.  How does that work?  An agent can work for a

18   manufacturer?

19   A.    Correct.

20   Q.    What can they do under this section without a

21   registration?

22         MR. GOLDSTEIN:  Your Honor, I just object.  She has

23   no expertise to tell this Court what the statute means.

24         THE COURT:  I agree.  Now, if you want her to read

25   something that would define what an agent can do, that would be

1  fine.  But for her to interpret, I think that's up to the

2  Court.

3            MS. BAGWELL:  Yes, Your Honor.

4  Q.  (BY MS. BAGWELL) Ms. McGuire, does this statute show that

5  an agent of any manufacturer falls under Section H?

6  A.  Can you repeat?

7  Q.  Under Subsection 1, does an agent of any registered

8  manufacturer fall into this Subsection H exception?

9  A.  Yes.

10 Q.  And does the exception say that the -- that person is not

11 required to register and may lawfully possess a controlled

12 dangerous substance?

13 A.  Yes.

14 Q.  Does the statute say they may manufacture?

15 A.  No.

16 Q.  Additionally, can you read this last underlined section?

17 A.  "If such agent is acting in the usual course of such

18 agent's or employee's business or employment."

19            MS. BAGWELL:  Can we pull up Exhibits 2 and 6 side by

20 side, Brandi?

21 Q.  (BY MS. BAGWELL) You got asked quite a few questions about

22 these two exhibits.  And I just want to clear a few things up.

23            MS. BAGWELL:  Thank you.  Can you go ahead and go to

24 page 2 of Exhibit 6?

25 Q.  (BY MS. BAGWELL) What is on -- on the left side of the

1   screen, this date completed.  What does that mean?

2   A.   So that's the date that that particular application was

3   submitted to OBN.

4          MS. BAGWELL:  And can we go to page 17, Brandi, of

5   Exhibit 2?

6   Q.   (BY MS. BAGWELL) So this was submitted in 2020.  This

7   question on the dashboard, how do you know that it wasn't on

8   there at the time?

9   A.   So in our system -- in this particular system, when we

10  switched over, if the applicant was not required to answer that

11  if the question wasn't there or if it wasn't a required answer,

12  then it's blank.  Like, you can see there's no answer to that

13  question.

14  Q.   So once that question was added, it was required to be

15  answered?

16  A.   Yes.

17         MS. BAGWELL:  Can we go to page 2 on Exhibit 6?

18  Q.   (BY MS. BAGWELL) We can see -- so we can see that they

19  have answered on this one?

20  A.   Yes.

21  Q.   So can you answer afterwards or you have to answer when

22  you submit the application?

23  A.   So because some of the applications were pending, you

24  could -- you can actually answer that question after the

25  original application was submitted.  This particular question

1  was answered by the applicant at some point no matter when they

2  submitted their application to us.

3  Q.    Okay.  This is a question affirming that you will follow

4  certain statutes, correct?

5  A.    Yes.  Yes.

6  Q.    Did those statutes already exist?

7  A.    Yes.

8  Q.    So those statutes were already in effect, even before you

9  asked an applicant to affirm they would follow them?

10 A.    Correct.  Yes.

11 Q.    Why did OBN put in a question like this on their

12 applications?

13 A.    Because we consistently had attorneys trying to find

14 loopholes and trying to argue that we did not understand our

15 own laws and everything and that they were allowed to provide

16 false information, they were allowed to have these third-party

17 unregistered individuals.  So we had to make it very clear and

18 in black and white in writing that this is not allowed and they

19 affirm that they are not one of these kind of loopholes that

20 people were trying to create.

21 Q.    And you say "trying to create," is that because those

22 statutes that they're affirming they will follow were in effect

23 the entire time?

24 A.    Yes.

25 Q.    Now, unless a lawyer owns the medical marijuana business,

1   is putting their email as the owner email false information?

2   A.   Yes.

3   Q.   And unless a lawyer owns the medical marijuana business,

4   is putting their cell phone false information?

5   A.   Yes.

6   Q.   Once you guys realized that Mr. Stacy was submitting this

7   information, is that when OBN began to cease approving these

8   applications?

9   A.   Yes.  Yes.  We stopped approving applications, and then we

10  ended up denying -- like, 192 different applications were

11  actually denied in July of '21 that had this similar pattern.

12          MS. BAGWELL:  Can we pull up the spreadsheet again,

13  Brandi?

14  Q.   (BY MS. BAGWELL) So there are approximately 300

15  applications on this spreadsheet.  Just to be clear, are those

16  the ones OBN approved or are those the ones that Matt Stacy

17  submitted?

18  A.   These are just submitted.  Not all of them were approved.

19  Q.   And, in fact, did you just say that at least 191 of them

20  were denied once you recognized the pattern?

21  A.   Correct.  Yes.

22          MS. BAGWELL:  Can we pull up Defense Exhibit 154?

23      I'm sorry, 74, Brandi.

24  Q.   (BY MS. BAGWELL) This additional supplement, why did you

25  guys feel the need to implement that?

1  A.   So this was a result of us realizing that we had a pretty

2  significant problem in people trying -- in particular, a group

3  of -- a small group of attorneys and consultants that the

4  attorneys were working with would find Oklahoma -- Oklahoma

5  residents, people who lived here, and they would pay them just

6  to put their name on a license to circumvent the residency

7  requirement.  You have to be a resident of Oklahoma and you

8  have to own 75 percent of the business.  And we realized that

9  our application, as a whole, was not adequate enough to catch

10 the fraud because that's not what our system was designed for.

11 Doctors weren't pretending to have medical licenses to get a

12 registration with us.

13      And so we decided it was necessary and it was a long

14 process because also historically we have relied on the

15 licensing authorities to do all of this.  Unfortunately, the

16 Oklahoma Medical Marijuana Authority was also overwhelmed with

17 300,000 patient cards plus all the businesses, and so we had to

18 kind of duplicate the efforts as a result of all of this.  And

19 not only were these people -- the only way that the people

20 could obtain a registration, because they were out of state,

21 would be to find a fake Oklahoma owner, and then those

22 individuals went on and subsequently -- a lot of them

23 trafficked the marijuana and sold and diverted it.  Now, there

24 was a lot of other criminal activities, and they would not have

25 been able to do that without the efforts of these attorneys.

1  So that's why we did this.  And that's why we also interview

2  every single one of them in person.  It's a lot more difficult

3  to lie to an agent's face than it is from a computer.

4  Q.   And these attorneys, were Matt Stacy and Logan Jones the

5  most prominent of them?

6  A.   Yes.

7  Q.   And if someone submits false information and it doesn't

8  get caught right away, does that make that information true?

9  A.   No.

10 Q.   If someone commits fraud and doesn't get caught right

11 away, are they not committing fraud?

12 A.   Yes, they still are.

13 Q.   And you were shown some emails.  In any of the emails that

14 you can recall or that you've seen here today, did Matt Stacy

15 ever ask, in advance, I'm an attorney, I don't own this

16 business, can I put my information as the owner's information

17 for a controlled substance?

18 A.   I don't ever remember recalling him ever asking what

19 information he should put on anyplace.

20      MS. BAGWELL:  One moment, Your Honor.

21      No further questions.

22      THE COURT:  Further questions, Mr. Goldstein?

23                  RECROSS-EXAMINATION

24 BY MR. GOLDSTEIN:

25 Q.   You certainly never told him that he couldn't do that,

1  right?

2  A.   Not that I recall.

3  Q.   Right.  It's an established practice.  It's in application

4  after application after application, you're emailing with him

5  and your team is emailing with him week after week after week

6  with the same email addresses, and you don't know of a single

7  person, not yourself or anyone else on your team, whoever told

8  Mr. Stacy he couldn't do that?

9  A.   I'm not aware.

10 Q.   Okay.  You testified that attorneys looking for loopholes,

11 trying to make things clear, black and white, do you remember

12 that?

13 A.   Yes.

14 Q.   All right.  Attorneys, plural, right?

15 A.   Correct.

16 Q.   Not just Mr. Stacy, right?

17 A.   Correct.

18 Q.   Loopholes -- you would agree with me that clarity is a

19 good thing when you're issuing registrations to control,

20 disperse, dispense controlled substances, right?

21 A.   Yes.

22 Q.   And having things in black and white makes things clear,

23 right?

24 A.   For 70 years everything seemed very clear to all of our

25 other registrants, and it was in black and white, but

1  unfortunately this particular crowd was -- I don't know if they

2  were incapable of understanding the precedent that was already

3  set; but, yes, we realized very quickly that -- like, after we

4  saw the pattern, we realized very quickly we needed to figure

5  out how to remedy this.

6  Q.   Right.  There were loopholes, right?  That's your word.

7  A.   I mean, they found ways that they argued were loopholes,

8  yes.  We did not think they were loopholes, but they argued

9  that they were.

10  Q.   Okay.  You know, the discussion between --

11         MR. GOLDSTEIN:  Can I just get the document camera,

12  please?

13  Q.   (BY MR. GOLDSTEIN)  The discussion between Exhibit 2 and

14  Exhibit 6, I mean, let's just be clear.  Okay?  Exhibit 6 that

15  you submitted and spoke about with the government contains

16  language on it that wasn't on the application.  Meaning, this

17  document you submitted to the Court is not an accurate

18  representation of what was received by OBN, correct?

19  A.   That is Exhibit 2.

20  Q.   Right.

21  A.   Not 6.

22  Q.   Right.

23  A.   But the -- no matter what the system changes -- so that's

24  why on Exhibit 2 you see the two different versions.  You see

25  that system, you can see that it's actually at the bottom, you

JESSICA McGUIRE - REDIRECT EXAMINATION BY MR. GOLDSTEIN       346

1   can see it's a different platform than the next one; so, yes,
2   it is.
3   Q.   Yes, it is what?
4   A.   It is an accurate representation of the information
5   provided to us, yes.
6   Q.   This is?  This was on Exhibit 2?
7   A.   No.  That's not what I said.
8   Q.   My question is about Exhibit 2.  I don't know why it's so
9   hard for you to admit that this document is not an accurate
10  representation of what was submitted to OBN.
11  A.   You started your question saying Exhibit 6, so that's why
12  I wanted to make sure what we were talking about.
13  Q.   Yes.
14  A.   However, when you can see the information provided to us
15  is the exact same on this page you're showing right now, where
16  it has the platform you can see the URL at the bottom, the gov
17  platform, the information provided on that is the exact same
18  information provided on the other version.
19  Q.   Was this language on the application that was submitted by
20  the Stacy Legal Group, this language right there?  Was that on
21  the application submitted by the Stacy Legal Group for this
22  application?
23  A.   No.
24  Q.   Right.
25  A.   Not in 2020.

1  Q.    Not on this application?

2  A.    Not on this exact one, correct.

3  Q.    No, not on the application they filed.  This application.

4  A.    On this exact application, correct.

5  Q.    Right.  So this is not an accurate representation --

6            MS. BAGWELL:  Your Honor, this has been asked and

7  answered multiple times at this point.

8            THE COURT:  Overruled.  The point being, Exhibit 2, I

9  guess, was offered and in the state court prosecution; is that

10  correct?

11            MR. GOLDSTEIN:  Yes.  Versions of it, yes.

12            THE COURT:  Actually, I'm asking the witness.  Is

13  that correct?

14            THE WITNESS:  I believe so.  Can you turn the page?

15  What business is this?

16            THE COURT:  Well, bottom line, when Exhibit 2 was

17  submitted to the State, did it have that affirmation at the

18  end?

19            THE WITNESS:  No.  So that's --

20            THE COURT:  That's all I need to know.

21            MR. GOLDSTEIN:  Thank you.

22            THE WITNESS:  Yeah.  Sorry.

23  Q.    (BY MR. GOLDSTEIN) You said that 191 applications were

24  denied in July of 2021, correct?

25  A.    Correct.

1  Q.   Not all 191 of those were Mr. Stacy's applications,

2  correct?

3  A.   Correct.

4  Q.   And you testified that it was denied, in part, I think you

5  testified, because of this email address and telephone number

6  that were on the application; is that your testimony?

7  A.   I didn't testify to why they were denied.

8  Q.   Okay.  Well, we know why they were denied, because

9  Mr. Russell put it -- Mr. Cochran put it in his email.  He said

10 it was denied because of the business structure, right?

11 A.   That's what that says, yes.

12 Q.   Okay.  Back to Exhibit 2, one last series of questions.

13 So Exhibit 2 is an application for Levi Green LLC, do you see

14 that?

15 A.   Yes.

16 Q.   It lists Ms. Carrillo as 75 percent owner of that

17 particular entity, Levi Green LLC.

18 A.   Yes.  Correct.

19 Q.   Are you aware that that is literally true, that

20 Ms. Carrillo is a 75 percent owner of this Levi Green LLC?

21 A.   I am not aware of that.  That's what she told us on

22 this -- or that's what someone told us on this application, but

23 I've never seen their business records.

24 Q.   Do you have any evidence with you today that that

25 statement is not literally true, that she's not 75 percent

```
 1   owner of Levi Green LLC?

 2   A.    I wouldn't have that information.

 3           MR. GOLDSTEIN:  Thank you.  Nothing further, Your

 4   Honor.

 5           THE COURT:  Anything further?

 6           MS. BAGWELL:  No, Your Honor.

 7           THE COURT:  You may step down.  You're excused.

 8       Let's take a 15-minute recess.  Court will be in recess.

 9       (Recess had.)

10           THE COURT:  Be seated.  Call your next witness.

11           MR. COFFEY:  United States calls Alicia Martinez.

12                       ALICIA MARTINEZ,

13       called as a witness on behalf of the government, having

14   been first duly sworn to tell the truth, testified as follows:

15                       DIRECT EXAMINATION

16   BY MR. COFFEY:

17   Q.   Good morning, Agent.  Will you introduce yourself to the

18   Court.

19   A.   Alicia Martinez, agent with the Oklahoma Bureau of

20   Narcotics.

21           THE COURT:  You're going to need to speak up.

22           THE WITNESS:  Oh, I'm sorry.  Alicia Martinez, agent

23   with the Oklahoma Bureau of Narcotics.

24   Q.   (BY MR. COFFEY)  And, Agent Martinez, you can even pull

25   that mic closer to you if you want.  It will be easier for all
```

1  of us, I think.

2      Agent Martinez, how long have you been with OBN?

3  A.   Twenty years.

4  Q.   Have you been an agent for those entire 20 years?

5  A.   No, sir.

6  Q.   Okay.  When did you become an agent?

7  A.   The end of 2017.

8  Q.   And when you first became an agent, what were you doing

9  with OBN?

10 A.   I was in the Diversion Unit.

11 Q.   Okay.  Now, let's jump forward to 2018/2019, what are you

12 primarily doing as part of your role and responsibility with

13 OBN?

14 A.   2018/2019, I was in the Diversion Unit.  We were tasked

15 with investigating crimes and administrative actions set forth

16 by Title -- Title 475 and 63.

17 Q.   And so were you working exclusively on stuff involving

18 marijuana or other registrants, like doctors, pharmacies,

19 things like that?

20 A.   All registrants.

21 Q.   Okay.  Eventually you start to investigate some grows that

22 OBN had identified as being set up illegally.

23 A.   Yes.

24 Q.   When did -- and did you transition from, you know,

25 investigating primarily other registrants, like doctors and

ALICIA MARTINEZ - DIRECT EXAMINATION BY MR. COFFEY          351

1  pharmacies, to mainly marijuana farms?

2  A.   With the influx of marijuana registrations that came in

3  during that time frame, it primarily took up a lot of our time.

4  And so even though we were tasked with all registrants,

5  marijuana took a bulk of our responsibility time.

6  Q.   Okay.  And as you are reviewing some of the information on

7  these registrants' applications, do you start to see some

8  irregularities?

9  A.   Yes.

10  Q.   What do you start seeing?

11  A.   The first big regularity (sic) I saw was an address that

12  popped up multiple times in Blanchard, Oklahoma.

13  Q.   Okay.  An address on what?

14  A.   An address for a marijuana grow -- well, multiple

15  marijuana grows with the same address.

16  Q.   Okay.  So the application said that the facility address

17  was this address in Blanchard?

18  A.   Yes.

19  Q.   Okay.  Did you go out and investigate?

20  A.   Yes.

21  Q.   Did you determine what that address in Blanchard actually

22  was?

23  A.   It was an open field that was for sale.

24  Q.   Okay.  Did you -- were you able to investigate any other

25  property around the open field in Blanchard?

1    A.   While I was there, I saw across from the open field there

2    was a mailbox with the name "Stacy" on it.

3    Q.   The property with the mailbox that said "Stacy," did you

4    do some additional investigation?

5    A.   Yes.

6    Q.   What did you determine about that property?

7    A.   That was the personal residence of Matt Stacy.

8    Q.   Okay.  And to be clear, this field across the house that

9    were on the OBN registrations, was there any marijuana farm

10   there?

11   A.   No.

12   Q.   Did you do some additional investigation about where else

13   that address had been listed?

14   A.   Yes.

15   Q.   Did you look and see if it had been listed on OMMA

16   licenses?

17   A.   Yes.

18   Q.   Okay.  How many times had it been listed on OMMA licenses?

19   A.   I want -- as I remember properly, it was probably over a

20   hundred.

21   Q.   Okay.

22         MR. GOLDSTEIN:  I'm sorry.  Was that OMMA

23   applications?

24         MR. COFFEY:  Yeah.

25         MR. GOLDSTEIN:  Okay.

ALICIA MARTINEZ - DIRECT EXAMINATION BY MR. COFFEY            353

1  Q.  (BY MR. COFFEY) Let's jump forward to August of 2020.

2  Okay?

3            THE COURT:  August of when?

4            MR. COFFEY:  August of 2020, Your Honor.

5  Q.  (BY MR. COFFEY)  And, Agent Martinez, would this be the

6  time you're still investigating some of the irregularities on

7  the OBN registrations?

8  A.  Yes.

9  Q.  August of 2020, do you go out to a grow at Ping Two LLC in

10 Luther, Oklahoma?

11 A.  Yes.

12 Q.  Okay.  Now, was this OBN's first time to go out to that

13 grow in Luther?

14 A.  No.

15 Q.  Okay.  Do you know what agents had discovered at the first

16 inspection or time they went out to the grow?

17 A.  Yes.  They found some security issues that included

18 non-self-closing locking doors, the improper fencing

19 requirements, improper records, and growing prior to OBN

20 registration being issued.

21 Q.  And when you say "problems with records," what do you mean

22 problems with records?

23 A.  Records -- they didn't have any on site.

24 Q.  What records was OBN asking for?

25 A.  OBN requires any records that has to do with the

1    controlled dangerous substances, i.e., the marijuana.  The

2    marijuana, where they got the seeds, where they got the

3    seedlings, where they got the plants, and any kind of sales,

4    invoices, transportation of any kind of marijuana to or from

5    that location.

6              MR. COFFEY:  And, Your Honor, I'm just trying to move

7    this along quick, so I'm just going to ask it this way.

8    Q.   (BY MR. COFFEY) Based on your experience investigating

9    these grows, is a grow that doesn't have readily retrievable

10   records about where all their plants have been, how many plants

11   on site, who they've sold them to, where they got the seeds, is

12   that consistent with black-market activity?

13   A.   Yes, that's indicative of black-market or illegal sales of

14   marijuana.

15   Q.   Because black-market marijuana traffickers aren't going to

16   keep records, are they, of where they got their illegal

17   product?

18   A.   No.

19   Q.   Okay.  So you're out there after this first inspection,

20   second inspection in August of 2020, do you remember the actual

21   date?

22   A.   No, I do not recall the exact date.

23   Q.   But do you remember the inspection?

24   A.   Yes.

25   Q.   While you're out there, do you see any of the same

1   problems that OBN had previously identified the month prior?

2   A.   Yes.

3   Q.   Okay.  What problems?

4   A.   The fence was still not to sufficient standards.  Again,

5   no records were on site.  There were no self-closing, self-

6   locking doors.  There was no security system set in place.

7   Q.   Do the workers on site, I guess -- assuming there are

8   workers on site, is that fair?

9   A.   Yes.

10  Q.   Do they call their attorney?

11  A.   Yes.

12  Q.   Okay.  Is their attorney Matt Stacy?

13  A.   Yes.

14  Q.   Do you get on a phone call with Matt Stacy?

15  A.   Yes.

16  Q.   Do you explain all these problems?

17  A.   Yes.

18  Q.   What else do you remember about the phone call?

19  A.   During that phone call, he indicated he had some of the

20  records for Ping Two and that he would supply them to me.

21  Q.   Did he ever supply them to you?

22  A.   No.

23  Q.   Did you ask him multiple times for the records?

24  A.   Yes.

25  Q.   Do you think these records even existed?

```
 1              MR. GOLDSTEIN:  I object, Your Honor.  There's no
 2    basis for that.
 3              MR. COFFEY:  I'll rephrase.
 4    Q.  (BY MR. COFFEY)  To this day, sitting here, has Matt Stacy
 5    ever provided you any records regarding Ping Two?
 6    A.  No.
 7    Q.  Okay.  So eventually do you come across the name Helen
 8    Carrillo?
 9    A.  Yes.
10    Q.  Okay.  In February of 2021, you go inspect a grow tied to
11    Ms. Carrillo?
12    A.  Multiple, yes.
13    Q.  Multiple.  What were some of the common things you found
14    at these multiple grows tied to Helen Carrillo?
15    A.  When I talked to the workers or people on site, they did
16    not know who Helen Carrillo was.
17    Q.  Was that odd to you?
18    A.  Yes.
19    Q.  Why was that odd to you?
20    A.  She was the registration holder.
21    Q.  Okay.  Was she listed as an owner of the business?
22    A.  As far as -- as far as OBN records, yes.
23    Q.  These grows, were they up to code on security measures?
24    A.  No.
25    Q.  Did they have some of the seed-to-sale and other records
```

```
 1  that we discussed earlier?
 2  A.   No.
 3  Q.   So these grows, where were they in Oklahoma?
 4  A.   They were near and around the Oklahoma City metro area.
 5  Q.   Okay.  And were there other grows tied to Carrillo that
 6  you didn't investigate?
 7  A.   Yes.
 8  Q.   Other parts of the state?
 9  A.   Yes.
10  Q.   Eventually, do you go contact Helen Carrillo?
11  A.   Yes.  The following week.
12  Q.   When was that?
13  A.   That was March 1st of 2021.
14  Q.   Okay.  Where did she live?
15  A.   Enid, Oklahoma.
16  Q.   Okay.  Who went out there?
17  A.   Me and fellow OBN agents.
18  Q.   Okay.  And when you went out there, who was at the
19  residence?
20  A.   Helen Carrillo, her children, and her husband, Rafael
21  Carrillo.
22  Q.   Was there a team of agents out there too?
23  A.   Yes.
24  Q.   And did you speak with Ms. Carrillo?
25  A.   Yes.
```

1  Q.   And while you are with Ms. Carrillo, does she call her

2  attorney?

3  A.   Yes.

4  Q.   And did you then -- and who was her attorney?

5  A.   Matt Stacy.

6  Q.   I say "her" attorney, did she say "he's my attorney"?  If

7  you don't remember, that's okay.

8  A.   I don't recall if she said that.

9  Q.   But she got Matt Stacy on the phone, didn't she?

10 A.   I believe her husband called, yes.

11 Q.   And this interview with Matt Stacy, did you ask him

12 questions about his relationships to the Carrillos?

13 A.   I asked about the business, yes.

14 Q.   Okay.  And was that portion with the interview with

15 Mr. Stacy recorded?

16 A.   I'm sorry.  Say that again.

17 Q.   Was that portion with Mr. Stacy, the interview, recorded?

18 A.   Yes.

19        MR. COFFEY:  Your Honor, at this time, I'm going to

20 play Exhibit 20, which is the interaction with Helen Carrillo

21 and then the interview of Matt Stacy while they are all

22 together.

23        MR. GOLDSTEIN:  No objection.

24        THE COURT:  Go ahead.

25     (Exhibit 20 played for the Court.)

1   Q.   (BY MR. COFFEY) Is that your voice?

2   A.   Yes.

3        (Audio played.)

4   Q.   The woman that just said she works from home, is that

5   Helen Carrillo?

6   A.   Yes.

7        (Audio played.)

8   Q.   How many grows does she say that she has at this point?

9   A.   She says "a handful."

10       (Audio played.)

11  Q.   She says on March 1 she owns how many?

12  A.   That she thinks five, but she's not 100 percent sure.

13       (Audio played.)

14  Q.   Let me get straight, so what -- you ask her:  Are you the

15  sole owner of these companies?

16  A.   Yes.

17  Q.   And what does she say?

18  A.   She said, yes, she was.

19  Q.   Okay.  Was she the sole owner of these companies?

20  A.   No.  She was 75 percent.

21  Q.   Did she even know that there was another 25 percent owner

22  of the company?

23  A.   It didn't appear so.

24       (Audio played.)

25  Q.   I'm confused.  You said that you investigated her name

1  attached to grows, right?

2  A.   Yes.

3  Q.   She's mentioning dispensaries.

4  A.   Yes.

5  Q.   Why the discrepancy?

6  A.   It didn't appear that she knew what was going on.

7  Q.   She didn't know that she's listed on grows, does she?

8  A.   No.

9  Q.   She thinks they're all dispensaries.

10  A.   Correct.

11       (Audio played.)

12  Q.   So did Matt tell her she was the only owner?

13  A.   Matt did not tell me.

14  Q.   No, no.  Did Matt tell Ms. Carrillo that she was the only

15  owner, based on this recording?

16  A.   Yes.

17       (Audio played.)

18  Q.   Does she know the locations of these farms?

19  A.   No.

20  Q.   Did she know that they were farms?

21  A.   No.

22  Q.   Had she ever been at any of these farms?

23  A.   No.

24  Q.   Was she aware if marijuana was on site?

25  A.   No.

1          (Audio played.)

2    Q.   What is she listing right now?

3    A.   The names of -- the names of what she believes are

4    dispensaries that she DocuSigned and sent back to Matt Stacy.

5    Q.   The handful of ones she knew about?

6    A.   Yeah.  She's reading out of her email, correct.

7          (Audio played.)

8    Q.   So I want to be clear on this because it matters later.

9    Who does Helen Carrillo say sets everything up?

10   A.   She says she doesn't -- she doesn't do it, that the

11   attorney works it out.

12   Q.   Does Helen Carrillo ever say "I set everything up"?

13   A.   No.

14         (Audio played.)

15   Q.   When you're asking your deal with that -- she says "that

16   I'm not dealing with that," what is she talking about?

17   A.   With the fines or the -- and I took it as business in

18   general.

19   Q.   Okay.

20         (Audio played.)

21   Q.   So who was talking right there?

22   A.   That's Rafael Carrillo.

23   Q.   What is he doing at the time?

24   A.   At the time?

25   Q.   Was he on the phone with somebody?

1   A.   Yes, he's on the phone with somebody.

2        (Audio played.)

3   Q.   So is Matt Stacy now on the phone with Rafael Carrillo?

4   A.   Yes.

5        (Audio played.)

6   Q.   Does Matt Stacy tell Mr. Carrillo that they've got no

7   liability with these marijuana grows?

8   A.   Yes.

9        (Audio played.)

10  Q.   There's some inside joke there about talking every week?

11  A.   I had spoken with him just the week prior.

12  Q.   About what?

13  A.   About another grow.

14  Q.   Alerting him to violations?

15  A.   Yes.

16  Q.   Did you ask for any records at that time related to that

17  grow?

18  A.   Yes.

19  Q.   Did he ever give you those records?

20  A.   No.

21       (Audio played.)

22  Q.   What does Matt Stacy say that Helen Carrillo has done?

23  A.   Hired people to run the business.

24  Q.   Based on your conversation with Ms. Carrillo just prior,

25  has she hired, to her knowledge, anybody to run a business?

ALICIA MARTINEZ - DIRECT EXAMINATION BY MR. COFFEY          363

```
 1  A.   No.
 2       (Audio played.)
 3  Q.   He says they use different people, who is he referring to?
 4  Who is "they"?
 5  A.   "They" -- I assume that that means "they" as in the
 6  Carrillos.
 7       (Audio played.)
 8  Q.   Who does she say acquires the license?
 9  A.   She acquires the license.
10  Q.   No, no, no.  Sorry.  Who did Mr. Stacy say acquires the
11  license?
12  A.   I'm sorry.  I couldn't hear very well.
13  Q.   Okay.  I'll back it up.
14       MR. GOLDSTEIN:  I can stipulate if you want to save
15  it, Mr. Coffey.
16       MR. COFFEY:  You'll stipulate Mr. Stacy says that she
17  -- that Helen Carrillo acquires the license?
18       MR. GOLDSTEIN:  If that's what it says, yes, that's
19  fine.  Yes, stipulate.
20       (Audio played.)
21  Q.   (BY MR. COFFEY)  Again, does Mr. Stacy say that Helen
22  Carrillo goes and hires people to run the operation?
23  A.   Yes.
24  Q.   Was that true, based on your conversation with Helen
25  Carrillo?
```

1   A.   No.

2        (Audio played.)

3   Q.   How many grows does Mr. Stacy say Helen Carrillo is listed

4   on?

5   A.   He doesn't.

6   Q.   I think he's asked.

7   A.   Yeah, he's asked.  He said "I have a list."

8   Q.   Let me back up.

9        (Audio played.)

10  Q.   How many does Mr. Stacy say she's listed on?

11  A.   I believe he said 15, but I can't --

12  Q.   He didn't say a handful?

13  A.   A handful.  Okay.  Fifteen, handful.  That's --

14  Q.   Fifteen to a handful, is that consistent with how many

15  she's listed on?

16  A.   No.

17  Q.   Okay.  How many was she listed on?

18  A.   More than 30 at that moment.  As OBN.

19  Q.   And it's different from OMMA licenses, right?

20  A.   Right.

21  Q.   Of which she apparently is the owner of a licensing

22  company, right?

23  A.   There was, I believe at that moment, over 100 applications

24  at OMMA with her name on it.

25  Q.   Mr. Stacy is telling you there are a handful?

ALICIA MARTINEZ - DIRECT EXAMINATION BY MR. COFFEY                365

```
 1  A.    And a handful with OBN.

 2  Q.    Okay.

 3        (Audio played.)

 4        So, again, who is starting the business?

 5  A.    Helen Carrillo.

 6        (Audio played.)

 7  Q.    So again, is he stating that Helen Carrillo is hiring

 8  people to run the management company?

 9  A.    Yes.

10  Q.    But did Ms. Carrillo even know about a management company?

11  A.    No.

12        (Audio played.)

13  Q.    So are you still waiting on these records from Ping Two

14  that you inspected, oh, nine months before in order to

15  determine it's not a black-market facility?

16  A.    Yes.

17        (Audio played.)

18  Q.    Again, does he confirm she's only the owner on "a handful

19  of grows"?

20  A.    Yes.

21        (Audio played.)

22  Q.    So has Ms. Carrillo been standing there for your entire

23  conversation with Mr. Stacy?

24  A.    Yes.

25  Q.    And even after this phone call, can she explain how this
```

1   business structure works?

2   A.   It doesn't appear so.

3   Q.   At any point in this conversation does Ms. Carrillo state,

4   oh, I actually gave consent to Mr. Stacy by and through my

5   husband for them to place whatever licenses they want under my

6   name?

7   A.   No.

8        (Audio played.)

9   Q.   Does the interview terminate shortly after that?

10  A.   Yes.

11  Q.   And the date of that interview was?

12  A.   March 1, 2021.

13  Q.   Okay.  Do you guys go back to the Carrillos' residence the

14  next day?

15  A.   Yes, sir.

16  Q.   Okay.  Why did you go back?

17  A.   I had more follow-up questions related to this

18  conversation.

19  Q.   Okay.  The Carrillos get Mr. Stacy back on the phone when

20  you visited him -- visited the Carrillos March 2nd?

21  A.   Yes.

22  Q.   What did Mr. Stacy say?

23  A.   He said he was invoking for his clients and we needed to

24  leave.

25  Q.   Now, Mr. Carrillo, then, interviewed with you guys later,

ALICIA MARTINEZ - DIRECT EXAMINATION BY MR. COFFEY          367

 1  did he not?

 2  A.    Yes.

 3  Q.    Okay.  Seems like a little bit of a discrepancy.  Was the

 4  attorney/client invoked or not?

 5  A.    Rafael said to me, "He's not my attorney."

 6  Q.    And shortly after leaving Carrillos, did you get a text

 7  message?

 8  A.    It was while I was there.

 9  Q.    While you were there.  And who was the text message from?

10  A.    Matt Stacy.

11  Q.    And what did the text say?

12  A.    Said he was invoking for his clients, that I could not

13  speak with them and that we needed to leave.

14  Q.    Did that surprise you?

15  A.    Yes.

16  Q.    You have been in law enforcement for a while, right?

17  A.    Right.

18  Q.    Why did that surprise you?

19  A.    I've never had an attorney invoke for the clients while

20  the client are there.

21  Q.    Based on your interaction with Mr. Stacy, do you think he

22  was trying to hide something?

23  A.    Yes.

24  Q.    Why would he be trying to hide something?

25  A.    My personal opinion is there was a lot of criminal

 1  activity, and I think he was trying to hide his part in it.

 2  Q.   Okay.  And we just listened to the entire recording, I'm

 3  not going to go through it again.  Based on that phone

 4  conversation with Mr. Stacy, was he honest about how this

 5  ownership structure and business worked with Helen Carrillo?

 6  A.   No, he was not.

 7           MR. COFFEY:  Pass the witness.

 8           THE COURT:  Cross-examine.

 9           MR. GOLDSTEIN:  Thank you, Your Honor.

10                    CROSS-EXAMINATION

11  BY MR. GOLDSTEIN:

12  Q.   Agent Martinez, just while I get cleaned up.  I'm

13  confused.  How did you find Helen Carrillo?  Because you didn't

14  have her phone number and email.  How did you find her?

15  A.   Her home address.

16  Q.   Is that on the applications that are filed with OBN?

17  A.   I do not recall, but I believe so.

18  Q.   Wasn't hard finding her, right?

19  A.   Pardon?

20  Q.   Wasn't very hard to find her, was it?

21  A.   No.

22           MR. GOLDSTEIN:  Could I have my computer on the

23  screen?

24  Q.   (BY MR. GOLDSTEIN)  This is your text with Mr. Stacy,

25  right?  That's your number on the top left corner, correct?

1  A.   Yes.

2  Q.   Okay.  So Mr. Coffey just went through the second text.

3  He texted you and said:  That please be advised, Helen and

4  Rafael are represented by counsel, are electing their right to

5  not talk.  Continuing to engage is a violation of their rights.

6       Do you see that?

7  A.   Yes.

8  Q.   Please disengage.

9       You testified earlier that Matt never got back to you

10 about Ping Two.  Remember testifying about that?  Asking for

11 records, never got them to you, never got back to you about

12 that, and you asked him again on March 1st on the recording we

13 just heard?

14 A.   I said I did not receive any records.

15 Q.   Right.  But he texted you on February 24th, the week

16 before, just about Ping Two, right?

17 A.   Yes.

18 Q.   Told you:  I have some of the seed receipts for ping 2,

19 working on getting the rest now.  My staff is helping them

20 consolidate and get complete, Matt Stacy.

21      You said thank you, right?

22 A.   Correct.

23 Q.   Did you ever follow up with him and ask him for these

24 records that he had?

25 A.   I spoke with him on the 3rd or on 3/1, which was --

1  Q.   Right.  What about between the 24th and the 1st?  Were you

2  so anxious to get these records, did you go to his office?

3  A.   No, sir.

4  Q.   Okay.  Eight months earlier for Ping Two you apparently

5  asked for these records, did you do anything -- did you go to

6  Mr. Stacy's office and request the Ping Two records from him

7  for those eight months?

8  A.   No.

9  Q.   You testified regarding an address in Blanchard, and I'm a

10 little confused about your testimony.  I think you said that

11 that address was used -- that address was not used on OBN

12 applications; isn't that right?

13 A.   It was.

14 Q.   It was.  Which one?

15 A.   There were several.

16 Q.   Which ones?

17 A.   I cannot recall the names of the grows.

18 Q.   So you're testifying under oath that that address was used

19 on several grows' applications to OBN?

20 A.   Yes.

21 Q.   Okay.  But it was used on -- at OMMA on hundreds, you

22 said, right?

23 A.   There were a lot, yes.

24 Q.   Okay.  And do you know those several, less than five, more

25 than five, that were submitted to OBN, that address?  How many?

1  Less than five or more than five?

2  A.   I would say less than ten.

3  Q.   Less than ten.

4       All right.  Do you know whether or not Mr. Stacy had been

5  terminated as the lawyer for those particular people who filed

6  those applications?

7  A.   No.

8  Q.   Do you know if Mr. Stacy had knowledge of those

9  applications being submitted with that address?

10 A.   He was the attorney on file for those applications.

11 Q.   And you're sure about that?

12 A.   No, I'm not 100 percent sure.  I've not seen the

13 applications.

14 Q.   Okay.  So you can't testify with certainty that Mr. Stacy

15 filed applications with that address, correct?

16 A.   No, I cannot.

17 Q.   Okay.  You testified that there was evidence at Ping Two

18 of black-market activity; do you remember that?

19 A.   I said it was -- indicated black market, correct.

20 Q.   Yes.  So this is Defendant's Exhibit 61.  This is your

21 report of August 26, 2020; do you see that?

22 A.   Yes.

23 Q.   All right.  This is what Mr. Coffey asked you about, this

24 visit out to Ping Two, correct?

25 A.   Yes.

1  Q.   All right.  So in your report you note that other agents

2  have been out there on July 1st, 2020, right?

3  A.   Yes.

4  Q.   And they say that during the inspection the person at the

5  grow took them into three buildings on the property which she

6  was cultivating marijuana.  While we did not count the plants

7  being grown, there appeared to be several hundred of them.  She

8  said she had been growing marijuana at that location for the

9  past seven months, had not sold any of it yet and identified

10  Mr. Stacy as her lawyer, right?

11  A.   Yes.

12  Q.   All right.  You're accounting what happened July 1st.  So,

13  you know, just about two months before you got there on August

14  26, right?

15  A.   Yes.  Approximately.

16  Q.   But you're aware that Ping Two ultimately got their OBN

17  registration, correct?

18  A.   Yes.

19  Q.   And they got it between the date of this first report,

20  July 1st, and your visit on August 26, right?

21  A.   Yes.

22  Q.   Meaning, after you say you found evidence indicative of

23  black-market activity and after you said they found -- excuse

24  me -- on July 1st you said they found evidence indicative of

25  black-market activity, correct?

1   A.   I can't speak -- it's -- for what they -- I can -- I put

2   in there what I -- what they put in their reports.

3   Q.   Yeah.

4   A.   And according to the evidence, it could have been black

5   market, correct.

6   Q.   Right.  And so notwithstanding your testimony that there

7   was evidence indicative of black-market activity, after that

8   inspection, OBN gave Ping Two an OBN registration, correct?

9   A.   Yes.

10  Q.   Okay.  There was another facility that you were involved

11  in, which is called Chow King; do you recall that?

12  A.   Chow King Z is that the one you're referring to?

13  Q.   Chow King, yes.  Do you recall visiting Chow King?

14  A.   Yes.

15  Q.   And you visited Chow King on October 15th of 2020,

16  correct?

17  A.   Yes.

18  Q.   Okay.  And Agent Paulk was with you?

19  A.   Yes.

20  Q.   Agent Peterson was with you?

21  A.   Yes.

22  Q.   And when you were at Chow King on October 15, 2020, they

23  had marijuana plants on the property in their possession

24  growing, correct?

25  A.   Yes.

1  Q.   All right.  They did not have an OBN registration at that

2  point in time, right?

3  A.   I do not recall.

4  Q.   Well, take a look at your report there.  You're there to

5  conduct a background registration.  Is that indicative -- how

6  about administrative violations engaging in activity prior to

7  registration approval?

8  A.   Yes.

9  Q.   So we're talking about that point in time when this

10 facility has no OBN registration, right?

11 A.   Yes.

12 Q.   They have an OMMA license, right?

13 A.   Yes.

14 Q.   And there's marijuana plants everywhere, right?

15 A.   There is a lot of marijuana plants, yes.

16 Q.   Okay.  And you testified that part of your job is to

17 investigate crimes.  You testified on direct examination that's

18 part of your job at OBN.

19 A.   Yes.

20 Q.   All right.  You didn't arrest anyone that day, right?

21 A.   No.

22 Q.   Didn't seize any plants?

23 A.   No.

24 Q.   Right.  In fact, if you recall, Agent Paulk told

25 Mr. Stacy, who was on the phone with the individual there on

1  October 15th, that growth before registration is fine, it's

2  just an admin thing; do you recall that?

3  A.    No, sir.

4  Q.    Okay.  Would you quarrel with me that that's what he told

5  Mr. Stacy and the individual there?

6  A.    No.  I heard the recording, yes, I believe he did say

7  that, but I was -- I was a little -- a little fired up when I

8  was talking on the phone, so I took a little walk.

9  Q.    Okay.  So you heard it on the recording, though?

10  A.    I did hear it on the recording.

11  Q.    Okay.  Now --

12         MR. GOLDSTEIN:  Your Honor, I'm going to move to

13  admit Defendant's Exhibits 151, 152, and 153.

14         THE COURT:  Any objection?

15         MR. COFFEY:  No objection, Your Honor.

16         THE COURT:  They'll be admitted.

17  Q.    (BY MR. GOLDSTEIN) This is an OMMA, Oklahoma Medical

18  Marijuana Authority, monthly reporting document, correct?

19  A.    That's what it appears to be.

20  Q.    And you've seen these, right?

21  A.    Yes.

22  Q.    In fact, as part of your responsibilities when you're

23  conducting these investigations -- and, in fact, we're going to

24  hear a recording of this when you talk to Mr. Stacy about it --

25  you get access to these monthly reports that are filed with

1  OMMA, correct?

2  A.   The access is limited; but, yes, I can request it.

3  Q.   And you did request it during the fall of 2021 and the

4  beginning of -- fall of 2020 and the beginning of 2021,

5  correct?

6  A.   Yes.

7  Q.   Okay.  Now, let's make sure the Court understands what

8  this is.  Okay?  So let me show you this.  Okay?  This is filed

9  by Mr. Stacy, correct?

10 A.   Yes.

11 Q.   And it's for the Chow King operation, right?

12 A.   Yes.

13 Q.   And it's reporting the month of December 2020, right?

14 A.   Yes.

15 Q.   And so, then, according to this document, Mr. Stacy

16 reported to the State, the Oklahoma Medical Marijuana

17 Authority, that Chow King, in December of 2020, had 1,310

18 marijuana plants at their facility, correct?

19 A.   If you can move your finger.

20 Q.   Sorry.

21 A.   That is seedlings only, correct.

22 Q.   Okay.  Seedlings only.  But he's filing a report that this

23 entity -- which is still not registered with OBN, right?

24 A.   I do not recall when they got registered.

25 Q.   They never got registered.  They were denied.  Do you

1  remember that?  Do you recall that or no?

2  A.    There were so many, so --

3  Q.    Well, we can go through that later.

4        This report, though, is by Mr. Stacy in December of 2020,

5  reporting to the State that Chow King has 1,310 seedlings,

6  right?

7  A.    Yes.

8  Q.    Disclosing to the State that a company without an OBN

9  registration has marijuana plants, correct?

10 A.    I don't know if he was aware if they had a license or not.

11 Q.    All right.  My question -- I know it's hard, right?  I

12 didn't ask you about what he knew.  My question is:  He is

13 submitting a report to the State that an entity without an OBN

14 registration has marijuana plants on it, correct?

15 A.    Yes.

16 Q.    Okay.  Defendant's Exhibit 152, same thing, right, a

17 report that's given to the Oklahoma Medical Marijuana

18 Authority, right?

19 A.    Yes.

20 Q.    Okay.  Again, this is Chow King, correct?

21 A.    Yes.

22 Q.    And now a woman by the name of Autumn Gold at Gold Star

23 Compliance is filing the report, correct?

24 A.    Yes.

25 Q.    And the month is February 2021, correct?

1   A.   Yes.

2   Q.   And they reported 1,450 marijuana plants, correct?

3   A.   Seedlings, yes.

4   Q.   Is there a difference between seedlings and plants in

5   terms of it being marijuana?

6   A.   Not in the terms of it being marijuana, but mature plants

7   would -- plants that could soon be processed and sold.

8   Q.   Okay.  Clearly disclosing to the State, to you, that this

9   company, without an OBN registration, is growing marijuana,

10  right?

11  A.   Yes.

12  Q.   Defendant Exhibit 153.  For Chow King, right?

13  A.   Yes.

14  Q.   Autumn Gold, correct?

15  A.   Yes.

16  Q.   March of 2021, right?

17  A.   Yes.

18  Q.   1,450 plants reported, right?

19  A.   Yes.

20  Q.   All right.  So these reports, filed by Mr. Stacy himself,

21  and Gold Star, is completely consistent with the information

22  they got from Agent Paulk on October 15th of 2020, that growing

23  before OBN registration is fine, it's just an admin thing,

24  correct?

25  A.   No.

1   Q.   It's not?

2   A.   It's not correct.

3   Q.   Why is that not consistent with what Mr. Paulk said?

4   A.   That is consistent with what you believe Mr. Paulk said.

5   Q.   Did he not say that?

6   A.   But growing without a marijuana license is still illegal.

7   Criminally illegal.

8           THE COURT:  Will you be a while with this witness?

9           MR. GOLDSTEIN:  A little bit, Your Honor, yes.

10          THE COURT:  Let's go ahead and take a noon recess.

11  Let's recess until ten minutes after one.

12          MR. GOLDSTEIN:  Thank you, Your Honor.

13      (Recess had.)

14          THE COURT:  All right.  Go ahead, Mr. Goldstein.

15          MR. GOLDSTEIN:  Thank you, Your Honor.

16  Q.   (BY MR. GOLDSTEIN) Agent Martinez, you testified -- we

17  were talking about the Chow King inspection on October 15th of

18  2020.  And I asked you questions about Agent Paulk telling

19  Mr. Stacy and his client during that visit that growth before

20  registration is fine, it's just an admin thing.  And you

21  suggested that you may have taken a walk when that statement

22  was made.  Do you recall that testimony?

23  A.   Yes, sir.

24  Q.   Okay.

25          MR. GOLDSTEIN:  So could I get my full screen on

1  the --

2  Q.   (BY MR. GOLDSTEIN)  Do you see that's at the 1:44 marker

3  there?

4  A.   Yes, sir.

5  Q.   Do you see that?  All right.  We're just going to play a

6  little clip.  Okay?

7       (Audio played.)

8       All right.  No ambiguity there, right, about what he told

9  Mr. Stacy and his client?

10 A.   No, sir.

11 Q.   Okay.  And then that was at about 1:50.  If we go a minute

12 later, okay, I'm going to play a little clip.

13      (Audio played.)

14      Did you hear that?  Want me to play it again?

15      (Audio played.)

16      "My boss is saying two weeks."  That's you that he's

17 talking about who said two weeks is fine for maybe a

18 reinspection, right?  Want to hear it again?

19 A.   Two weeks.  I heard "two weeks."

20 Q.   You heard your voice, right?

21 A.   Yes.

22 Q.   That's a minute later after he says "growing is fine,"

23 right?

24 A.   It appears so, yes.

25 Q.   Okay.  And he refers to you as his boss, right?

ALICIA MARTINEZ - CROSS-EXAMINATION BY MR. GOLDSTEIN          381

 1  A.   Yes.

 2          MR. GOLDSTEIN:  You can take my screen off, please.

 3  Thank you.

 4  Q.   (BY MR. GOLDSTEIN) Now, Chow King, it's been obviously

 5  abundantly clear, October 2020, they have plants on site, they

 6  don't have an OBN registration, right?

 7  A.   Yes.

 8  Q.   And as part of your job, you recommend either that a

 9  facility gets approved for an OBN or denied for an OBN, right?

10  A.   As an administrative, yes.  But as a criminal, there is

11  more to it.

12  Q.   Okay.  Well, let's look at Defendant's Exhibit 123.  This

13  is a form that you prepared.  Your name is right here, right?

14  Agent Martinez, right?

15  A.   Yes.

16  Q.   And the date is October 15th of 2020, right?

17  A.   Yes.

18  Q.   And your supervisor is apparently someone by the name of

19  Phillips, right?

20  A.   Yes.

21  Q.   And the date completed is October 16th, the day after you

22  were there, right?

23  A.   Yes.

24  Q.   All right.  You recommend that the registration be denied,

25  right?

1  A.   Yes.

2  Q.   But the reason you give is growing without proper security

3  measures; do you see that?

4  A.   Yes.

5  Q.   You don't say growing without an OBN registration, do you?

6  A.   It's obvious they don't have a registration because this

7  is our form that is submitted for them to get approved or not.

8  Q.   That's my point.  You denied it for security measures, not

9  because it's a farm without an OBN registration growing

10 marijuana?

11 A.   I said "growing."

12 Q.   Without -- does it say "without an OBN registration"?

13 A.   My boss would understand that because of this form.

14 Q.   What does it say?

15 A.   This is a registration form.

16 Q.   What does your words say?

17 A.   This is a registration form that is submitted when you --

18           THE COURT:  Answer his question.  What does it say?

19 Q.   (BY MR. GOLDSTEIN) What did you write?

20 A.   It says "growing without proper security measures."

21 Q.   Okay.  You testified regarding a facility known as Ying

22 Liu, Y-I-N-G, L-I-U.  And it's on Bison Road, right?

23 A.   Yes.

24 Q.   All right.  So let's just refer to it as Bison Road, if we

25 can.  Okay?

1     All right.  So I'm going to direct your attention to

2  Exhibit 78.  This is a medical marijuana background form that

3  you prepared, right?  That's your name, Alicia Martinez, right?

4  A.   Correct.

5  Q.   And it says on October 1st you traveled to one address,

6  21105 Bison Road, looked like they were green bean plants.

7  Then you went to 21015 East Bison Road, you see a large

8  greenhouse.  And that, you learned, was the address for Ying

9  Liu, correct?

10 A.   Yes.  There was an issue with their registration address

11 and the actual address.

12 Q.   Right.  So you went out there on October 1st, and they do

13 not have an OBN registration at that time, right?

14 A.   No.

15 Q.   Okay.  And you write at the bottom of your report:  In

16 terms of administrative violations, it's unknown if Ying Liu

17 Green is currently growing marijuana but there's no fencing.

18 Do you see that?

19 A.   Yes.

20 Q.   Okay.  So that's October 1 of 2020, right?  Right?

21 A.   Yes.

22 Q.   You have to answer the questions.

23     Okay.  Then you went -- the defense served a subpoena on

24 OBN in anticipation of this hearing, right?

25 A.   Yes.

1   Q.   And today you brought to me a thumb drive with certain

2   audio recordings, correct?

3   A.   Yes.

4   Q.   Okay.  And one of those audio recordings was you going

5   back to Ying Liu on Bison Road on November 5th of 2020.  Do you

6   recall that?

7   A.   Yes.

8   Q.   Okay.

9          MR. GOLDSTEIN:  Could I just get the audio, please?

10  Q.   (BY MR. GOLDSTEIN) All right.  So this is November 5,

11  you're at Ying Liu, right?  And they don't have an OBN

12  registration, correct?

13  A.   Right.

14  Q.   So this will be the introduction, just to orient you.

15  Okay?

16         MR. GOLDSTEIN:  And, Your Honor, for the record, I'll

17  be moving to admit the complete recording.  I just received it

18  today.  That will be Defendant's Exhibit, I think, 155.

19         THE COURT:  Any objection to 155?

20         MR. COFFEY:  No.

21         THE COURT:  155 is admitted.

22     (Defendant's Exhibit 155 played.)

23  Q.   (BY MR. GOLDSTEIN) That's your voice, right?

24  A.   Yes.

25         (Audio played.)

1  Q.   All right.  That refreshes your memory you were there

2  November 5th, Ying Liu, with Mr. Chaffin, right?

3  A.   Yes.

4  Q.   You went inside the facility, right, on that date?

5  A.   Yes.

6  Q.   Person granted you access to the facility, right?

7  A.   Yes.

8  Q.   And you observed marijuana plants at the facility,

9  correct?

10  A.   Yes.

11  Q.   All right.  Let's play that tape.

12       (Audio played.)

13       So this is just an extension of that same -- this is

14  another clip from that recording.  Okay?

15  A.   Okay.

16       (Audio played.)

17  Q.   Told you he learned to grow on YouTube, right?

18  A.   Yes.

19  Q.   And you're talking to him about the growth of the plants

20  that are in your presence at that time?

21  A.   Yes.

22  Q.   No OBN registration.

23  A.   Correct.

24       (Audio played.)

25  Q.   Okay.  And then one more clip again.

```
 1        (Audio played.)
 2   Q.   Taking photographs of the plants, right?
 3   A.   Yes.
 4   Q.   Not arresting him, right?
 5   A.   No.
 6   Q.   Not seizing the plants, right?
 7   A.   No.
 8        (Audio played.)
 9   Q.   So those were big plants, as opposed to the young ones you
10   had seen before, right?
11   A.   That's what it sounds like I was saying, yes.
12   Q.   Okay.  All right.  So, again, you are a law enforcement
13   officer, right?
14   A.   Yes.
15   Q.   Power to arrest, right?
16   A.   Yes.
17   Q.   Power to seize contraband?
18   A.   Yes.
19   Q.   All right.  And you're in there and you're having a casual
20   conversation with an individual without an OBN registration
21   about how he learned to grow on YouTube, how the young plants
22   look healthy and how there's some big ones in another room,
23   right?
24   A.   Yes.
25   Q.   Okay.  Let me show you what's been marked as --
```

1              MR. GOLDSTEIN:  Could I just have the document

2   camera?  I'm sorry.

3   Q.   (BY MR. GOLDSTEIN) The response to this was not to arrest

4   and prosecute that individual, but instead OBN issued a show

5   cause and notice of hearing to that person, right?

6   A.   Yes.  There were other conversations that were had before

7   that happened.

8   Q.   Okay.  So the date on this is November 6, 2020, right?  Do

9   you see the stamp?

10  A.   Yes.

11  Q.   All right.  It's the day after you were at the facility,

12  right?

13  A.   Yes.

14  Q.   Okay.  And at the end of the document -- let me just -- on

15  the preceding page, okay, it says:  As a business entity you

16  are to appear with legal counsel.  The hearing will be

17  digitally recorded, however, you have the right to the hearing

18  transcribed by a court reporter at your own expense.  Upon

19  proof by clear and convincing evidence, each violation carries

20  a possible administrative penalty of $2,000 for each act and

21  the possible refusal to issue an OBN registration.  Right?

22  A.   I can't see what you're reading.

23  Q.   Oh, I'm sorry.  Possible administrative penalty of 2,000

24  for each act and the possible refusal to issue an OBN

25  registration.  Right?

1   A.   That is what it says.

2   Q.   Okay.  So you go to a facility, a client of Mr. Stacy's,

3   right?

4   A.   Yes.

5   Q.   All right.  And you find marijuana at the facility, right?

6   A.   Yes.

7   Q.   There's no OBN registration, right?

8   A.   Yes.

9   Q.   And OBN's response to that is to schedule a hearing to

10  decide whether or not that facility will be issued an OBN?

11  A.   Yes.  But that's not the whole story.

12  Q.   Okay.  And that's in November of 2020, right?

13  A.   Correct.

14  Q.   All right.  And the possible penalty on this form says

15  $2,000 as an administrative penalty, right?

16  A.   That's what it says.

17  Q.   Okay.  All right.  I'll just ask the question.  If it's so

18  clear that it's illegal to grow marijuana after OMMA licensure

19  and an OBN registration, why do you have to schedule a hearing

20  where you have to prove by clear and convincing evidence the

21  entity is not entitled to an OBN, if it's so clear that it's a

22  crime?

23  A.   So with this one, this response right here is dealing with

24  their application for a registration.  A criminal end of it, we

25  can do both.  We can always issue a search warrant as well.  I

1  requested that a search warrant be done on this location and

2  was told, no, let's gather further evidence.  So you have to --

3  you still have to respond to the registrant as well in the

4  administrative end of it because they're requesting a

5  registration.  You can't just ignore the request.

6  Q.   If you walked in there and there was a brick of cocaine,

7  would you have walked out without seizing the cocaine?

8  A.   In that situation, there are different ways that you have

9  to deal with it.  A brick of cocaine, if we're trying to get

10 the bigger fish, there are steps that need to be done.  Now, if

11 we are -- if we walk in and see a brick of cocaine, no, I

12 cannot just take it.  I have to secure it and still ask for a

13 search warrant if it is inside of a residence.

14 Q.   So if you are granted lawful permission to enter a

15 facility and you observe a brick cocaine, and you are a law

16 enforcement officer with the power to arrest, are you telling

17 me that you would leave the brick of cocaine there and not

18 arrest the person?

19 A.   I'm saying if there's a brick of cocaine in there, I

20 cannot immediately arrest that person and do nothing.  I have

21 to secure the location and still ask for a search warrant.

22 Q.   Why can't you arrest them?  I don't understand.

23 A.   I can put them into custody.  I have to still do the other

24 items to take the cocaine from that location.

25 Q.   Have you ever heard of the Plain View Doctrine, where you

1   can seize drugs in your presence?

2   A.    Yes.

3   Q.    Wouldn't a brick of cocaine be in your plain view and be

4   illegal?  You need a search warrant?

5   A.    A search warrant to seize the cocaine and any other items

6   in that location.

7   Q.    Is that some rule specific to your agency?  Because that

8   is completely foreign to me, that you can see a drug, clearly

9   prohibited, outlawed, and you have to go apply for a search

10  warrant when you see that drug in your presence?

11  A.    That is -- the training and knowledge that I have is if

12  you see drugs in a location, you need to obtain a search

13  warrant to take the drugs out of that location.  Now, that

14  doesn't mean you leave the drugs and go.  It means you secure

15  the location.

16  Q.    Okay.  So you could have secured the location at Ying Liu,

17  right?

18  A.    Yes.

19  Q.    And what additional evidence would you need to gather more

20  than there's a business with drugs inside without an OBN

21  registration?  What additional investigation would you have to

22  do?

23  A.    What other investigation would I do?

24  Q.    You said I was told that we had to go the administrative

25  route, I asked for a search warrant, and I was told we needed

1  to do additional investigation.  What more investigation would

2  you need?

3  A.   There's more -- the owner of the location was not there.

4  That was a worker that was there.  The owner was not there.

5  Why is the owner not there?

6  Q.   That was the investigation you needed to conduct?

7  A.   No.  There's -- we were also investigating grows that

8  pertain to Matt Stacy, and that's the additional investigation.

9  Q.   So that was ongoing in October of 2020?

10  A.   Yes.

11  Q.   When did that begin?

12  A.   With Matt Stacy?

13  Q.   You just said you had a criminal investigation of Matt

14  Stacy, when did that begin?

15  A.   The first piece of evidence that I saw that criminal

16  activity was happening was when he put the address as across

17  the street from his residence or somebody put that as his -- at

18  the address of the grows.

19  Q.   You just said that when you were here in October, all

20  right, and November of 2020, the additional investigation had

21  to do -- because you had an investigation of Matt Stacy.  I'm

22  asking you when did the investigation of Mr. Stacy begin?

23  A.   I can't tell you exactly when it began, but it was before

24  this.  When I told you that I saw addresses in Blanchard,

25  that's when -- what made me -- prompted me to look more into

1   this.

2   Q.   So you began an investigation into Mr. Stacy after seeing

3   those addresses?

4   A.   Yes.  I was one of many agents, yes.

5   Q.   Okay.  And that began before October of 2020?

6   A.   Yes.

7   Q.   And as before -- this is Defendant's Exhibit 86.  Okay?

8   This is one of those forms that are filed with the Oklahoma

9   Medical Authority, right?

10  A.   That's what it appears to be.

11  Q.   Oklahoma Medical Marijuana Authority.  And so this is for

12  Ying Liu Green, do you see that?  I've highlighted it for you.

13  A.   Yes.

14  Q.   Okay.  This is a report that was filed in April of 2021,

15  right?

16  A.   That's what it appears to be.

17  Q.   It specifically tells you, OBN, through OMMA, that the

18  facility is currently operational, right?  Is the business

19  currently operational?  Answer is "yes."  Right?

20  A.   That's what it says.

21  Q.   Okay.

22  A.   But you say, "through OMMA to OBN."

23  Q.   Yes.

24  A.   We did not specifically get these reports unless they were

25  requested.

1  Q.   Right.  Well, you may want to temper the answer because

2  we're going to play a recording in a few minutes of you talking

3  to Matt about how you get access to the OMMA reports.  So let's

4  just focus on this document, and then we'll get to your access

5  to them.  Okay?

6       This is a report by Mr. Stacy's client in April of 2021

7  where he is disclosing the existence of plants at his client's

8  facility without an OBN registration, correct?

9  A.   That's what it appears to be.

10 Q.   3,000 immature plants, right, are reported?

11 A.   That's what it appears, yes.

12 Q.   And 3,000 mature plants are reported?

13 A.   Yes.

14 Q.   Showing you Defendant's Exhibit 84.  Again, for Ying Liu

15 Green LLC, right?

16 A.   That's what it appears to be.

17 Q.   Filed by a company called Gold Star Compliance for May of

18 2021, right?

19 A.   Yes.

20 Q.   Again, telling the State the business is operational

21 without an OBN, right?

22 A.   Yes.

23 Q.   And they reported 2,000 mature plants, right?

24 A.   Yes.

25 Q.   Exhibit 85, last one.  Again, Ying Liu Green, do you see

1  that in the bottom?

2  A.   Yes.

3  Q.   June 2021.  Again, reporting operational.  Reporting 2,000

4  immature plants.  Do you see that?

5  A.   Yes.

6  Q.   And 700 mature plants, do you see that?

7  A.   Yes.

8  Q.   Now, on February 23, 2021, you went back to the Bison Road

9  Ying Liu facility to conduct a follow-up inspection, right?

10  A.   Yes.

11  Q.   All right.  So you're there in October, you were there in

12  November, and now you're there February 23, 2021, right?

13  A.   Yes.

14  Q.   It's an inspection that you referenced, we heard, in the

15  March 1 recording that Mr. Coffey played for you when you were

16  talking to Mr. Stacy and you said, you know, asking about the

17  Bison Road records, you said you had requested during the week

18  prior, right?  You were referring back to this inspection on

19  February 23rd, right?

20  A.   Yes.

21  Q.   All right.  And so I -- unfortunately, I'm just going to

22  have to play this clip.  I want you to listen to this

23  recording.  Okay?  I'm going to stop it at certain points, but

24  I want you to stop me -- remember when you testified and

25  Mr. Coffey said you would ask for records regarding Bison Road

1  on that March 1st recording?  You said -- he stopped it, he

2  said, hey, you talked to Mr. Stacy a week earlier and you're

3  telling him you needed records regarding Bison Road, and you

4  had told him that during that earlier conversation.  This is

5  the inspection we're talking about, right?

6  A.   I believe so, yes.

7  Q.   All right.  I want you to tell me to stop playing when you

8  hear yourself telling Mr. Stacy that you needed additional

9  records on this date.  Okay?  All right?

10       (Audio played.)

11       Okay.  So February 23, 2021, you're at the Ying Liu

12  facility on Bison Road conducting an inspection and you're

13  about to have a conversation with Mr. Stacy on the phone,

14  right?  That's the scene.

15  A.   Yes.

16       (Audio played.)

17  Q.   "Set for hearing."  Is that in reference to the show cause

18  notice that we saw earlier?

19  A.   I believe so.

20  Q.   Okay.

21       (Audio played.)

22       Okay.  So he says to you, "Do you see any other issues at

23  the facility?"  Right?  Right?

24  A.   Yes.

25  Q.   And there were marijuana plants that you see at the

1  facility, right?

2  A.    Yes.

3  Q.    Okay.

4       (Audio played.)

5       So one of the issues you tell him is they don't have self-

6  closing, self-locking doors, right?

7  A.    Yes.

8       (Audio played.)

9  Q.    Fencing isn't up to code, right?

10  A.    Yes.

11       (Audio played.)

12  Q.    So far, you've not asked him for any records, right?

13  A.    No.

14       (Audio played.)

15  Q.    He's like, hey, did you know they conduct construction

16  boards, do inspections, right?  He's asking you if you were

17  aware of that.  Could you hear that or no?

18  A.    Yes, I heard that.

19  Q.    Okay.

20       (Audio played.)

21       He says self-locking doors is the big infraction that

22  you're seeing.  Did you hear that?

23  A.    Yes.

24       (Audio played.)

25  Q.    So he asked if there's anything you need, let him know.

1  You haven't asked him for anything, right?

2  A.    No.

3         (Audio played.)

4  Q.    (BY MR. GOLDSTEIN) He says:  Is there anything that

5  concerns you that I can resolve, right?

6  A.    Yes.

7         (Audio played.)

8  Q.    Okay.  So he's asked you for a second time, other issues,

9  you do not mention the fact that there's marijuana at a

10 facility without an OBN registration, right?

11 A.    Yes.

12        (Audio played.)

13 Q.    So he raises the plant count.  He raises the fact that

14 there's marijuana there, right?

15 A.    Yes.

16 Q.    He's talking to an OBN law enforcement officer, right?

17 A.    Yes.

18 Q.    And he's discussing with you openly the fact that his

19 client has marijuana without an OBN registration.

20 A.    Yes.

21 Q.    Okay.

22        (Audio played.)

23        So he's telling you he reported -- the facility reported a

24 thousand plants last month.  Those are those marijuana -- the

25 count reports that we saw to OMMA, right?

1  A.   Yes.

2       (Audio played.)

3  Q.   That's you telling Mr. Stacy that you get the reports from

4  OMMA, but there's a delay in getting them, right?

5  A.   A delay getting to OBN, not necessarily to me.

6  Q.   Let's listen to that again.

7       (Audio played.)

8       "Getting it from OMMA to us."  Who is "us"?

9  A.   OBN.

10 Q.   Right.  You're telling him you get the reports from OMMA,

11 there's a delay.

12 A.   Yes, there's a delay.

13 Q.   But you get them.

14 A.   OBN gets them.

15 Q.   Yeah.

16 A.   Yes.

17      (Audio played.)

18 Q.   You tell him the plant count is a lot higher than a

19 thousand, right?  Open discussion about drugs without an OBN

20 registration with Mr. Stacy, right?

21 A.   Yes.

22 Q.   What did you tell him during this conversation that could

23 lead Mr. Stacy to understand that it was OBN's position that

24 possession of marijuana without an OBN registration was

25 criminal?  What did you tell him?  How did you discourage the

ALICIA MARTINEZ - CROSS-EXAMINATION BY MR. GOLDSTEIN          399

1  growth of marijuana before registration during this one-to-one

2  conversation with Mr. Stacy?

3  A.   I didn't need to discourage him.  It's in state statute.

4  Q.   Okay.  So you didn't do anything to discourage him?

5  A.   I mean, he has a copy of the rules and the laws just as

6  well as everybody else in Oklahoma.

7  Q.   And you have access to them, right?

8  A.   Yes.

9  Q.   And you were standing in the presence of marijuana without

10  an OBN registration, right?

11  A.   Yes.

12  Q.   And you do nothing, right?

13  A.   Yes.

14      (Audio played.)

15  Q.   Agent Martinez, when during that call did you ask

16  Mr. Stacy to give to you a single record as to the Bison Road

17  property?

18  A.   I didn't.

19  Q.   Yet you said that to him on March 1st when you know -- you

20  know that you're recording that conversation, right?

21  Surreptitiously.  Did you tell Mr. Stacy you were recording the

22  call on March 1st?

23  A.   No.

24  Q.   Okay.  And so you know you're recording, and you say

25  something to him that's not true, that's a lie.  That you've

1  asked him for records, when you didn't.

2  A.   No, I didn't ask him for records during that call.

3  Q.   But that's what you said on March 1st, right?

4  A.   Yes.

5  Q.   Okay.  So let's talk about March 1st.  Okay?  March 1,

6  2021, you go to Helen Carrillo's property, right?

7  A.   Yes.

8  Q.   Wasn't hard to find her, right?

9  A.   Right.

10 Q.   Had her address, right?

11 A.   Yes.

12 Q.   Okay.  You show up, you have a conversation, we heard much

13 of it today.  Okay?  And eventually they put Matt on the phone,

14 on a speakerphone, right?

15 A.   Yes.

16 Q.   All right.  And Matt -- the original conversation that we

17 heard is Matt speaking to Rafael Carrillo, right?

18 A.   Yes.  At some point.

19 Q.   Right.  And Matt doesn't even know that there are agents

20 there and he's on a speakerphone, right?

21 A.   Yes.

22 Q.   And so Rafael catches him cold, there's no warning, right?

23 Matt didn't know you were coming there that day, right?

24 A.   No.

25 Q.   And so let me just play this clip.  I don't need to, it's

1  too long, it's fine.

2       You catch Matt cold, right?  Rafael has him on the phone,

3  he says, "Did they leave a card?"  And he says, "Oh, no,

4  they're here right now."  Matt says, "Okay.  Great."  You know,

5  "Who is it?"  "Is it Agent Martinez?"  You say, "Yeah, it's

6  Agent Martinez."  Do you remember that?

7  A.   Yes.

8  Q.   All right.  You catch Matt cold, he has no time to

9  prepare, he doesn't know that he's going to have a conversation

10  at that particular moment in time with Agent Martinez.  And who

11  else was there?  What other agents are there?

12  A.   Agent Chaffin and I'm not 100 percent sure of the other

13  two.

14  Q.   Someone has Rafael over here and you guys have Helen over

15  here, right?

16  A.   Rafael was outside with two.

17  Q.   There's two other agents with Rafael, you've separated

18  husband and wife.  You're questioning Helen.  Eventually,

19  Rafael comes in, put Mr. Stacy on the phone, right?  And

20  completely cold, he tells you everything you need to know about

21  his legal practice.  He tells you -- let me just play the clip

22  for you.

23       (Audio played.)

24       Tells you she doesn't participate in the grow, right?

25  A.   Correct.

ALICIA MARTINEZ - CROSS-EXAMINATION BY MR. GOLDSTEIN       402

```
 1   Q.   This is the first time you've asked him about his business
 2   structure, right?  You've talked to him many times, you never
 3   asked him the question, right?
 4   A.   No.
 5   Q.   Okay.
 6        (Audio played.)
 7        No profit, right?
 8        (Audio played.)
 9        Correct?
10   A.   Correct.
11        (Audio played.)
12   Q.   Explaining his structure to you, right?
13   A.   Yes.
14        (Audio played.)
15   Q.   Also told you about the management company, about how she
16   has no participation in the grow, no financial interest in the
17   grow, that she gets paid $5,000 for the asset of being a local
18   resident, right?
19   A.   That's what he tells me, yes.
20   Q.   Right.  He explains it to you when you ask him completely
21   cold for the first time on March 1, 2021, right?
22   A.   Yes.
23   Q.   You then say, will you -- "Can you send him to Russ?"
24   Have our general counsel take a look at them, right?
25   A.   Yes.
```

ALICIA MARTINEZ - CROSS-EXAMINATION BY MR. GOLDSTEIN          403

```
 1        (Audio played.)
 2   Q.   He says "Sure," right?  He'll share his agreements with
 3   general counsel of OBN, right?
 4   A.   Yes.
 5   Q.   Right?  Completely transparent, the way he's been
 6   transparent with you since October of 2020, when you asked him
 7   questions or you're there.  He's telling you, he'll tell
 8   Mr. Cochran, he'll talk to him about them and he'll share the
 9   agreements with him, right?
10   A.   That is what he is saying.
11        (Audio played.)
12   Q.   Says, "Is there anything else I can provide you all?"
13   Right?  Correct?
14   A.   Yes.
15   Q.   All right.  He also told you during that conversation --
16   it was glossed over when you did this on direct -- he actually
17   told you that he had shared those agreements with OMMA and they
18   had vetted them and approved them.
19        Let me play this clip for you.  Okay?
20        (Audio played.)
21   Q.   Did you hear that, "I shared them with OMMA"?
22   A.   Yes.
23        (Audio played.)
24   Q.   He said they understand it, right?  Did you hear that?
25   A.   That's what he's saying.
```

 1  Q.   Okay.  Now, at the beginning of the conversation, you say

 2  something to Mr. Stacy that I want to play for you.

 3       (Audio played.)

 4  Q.   You tell him on March 1st that you came out to see the

 5  owner of the grow because --

 6            MR. GOLDSTEIN:  Can I just get the document camera,

 7  please?

 8  Q.   (BY MR. GOLDSTEIN)  -- that's the normal course of

 9  business, right?

10  A.   Yes.

11  Q.   And then a little bit later, you tell him this.

12       (Audio played.)

13  Q.   You say, "Of course.  She's the 75 percent owner, we're

14  going to come see her about the grows."  Right?

15  A.   Yes.

16  Q.   Your words, "Of course."

17       (Audio played.)

18  Q.   For the records.  You say, "Of course we're going to go

19  see the owner for the records."  Right?

20  A.   Yes.

21       (Audio played.)

22  Q.   He says, "Yeah, yeah."  Right?

23  A.   I'm sorry.

24  Q.   He says, "Yeah, Yeah."  When you say, "Of course we're

25  going to go out and see the owner," he says, "Yeah, of course."

1    Right?

2    A.    He agrees, yes.

3    Q.    Okay.  So the point being that it's sort of foundational,

4    elemental, that you, as an OBN law enforcement officer, charged

5    with determining who gets an OBN registration or not, would go

6    see the person listed as 75 percent owner.  Your own words,

7    "normal course of business."  Those are your words.

8    A.    Okay.  Yes.

9    Q.    Right?

10        And you say to him, "Of course we're going to go see the

11   person listed at 75 percent."  Right?

12   A.    Yes.

13   Q.    But, of course, you never did go see Ms. Carrillo in June

14   of 2020, July of 2020, August of 2020, September of 2020,

15   right?

16   A.    I'm sorry?

17   Q.    You never went to see Ms. Carrillo in 2020, right?

18   A.    I saw her on March 1st of '21.

19   Q.    Right.  But you say, "the natural course of business."

20   Meaning, Mr. Stacy would understand -- you got Ms. Carrillo's

21   information on the application from Mr. Stacy, right?

22   A.    Yes.

23   Q.    He provided you her name on dozens of applications, right?

24   A.    Yes.

25   Q.    He listed her as 75 percent owner on dozens of

1  applications, right?

2  A.    Yes.

3  Q.    He listed her address on dozens of applications, right?

4  A.    Yes.

5  Q.    Right.  If the normal course of business, in your words,

6  would be to go out and see the owner of the facility, then you

7  had all of that information provided to you by Mr. Stacy at the

8  very inception of him using Ms. Carrillo in the summer or early

9  fall of 2020, right?

10  A.    At the summer of -- and early fall of --

11  Q.    2020, yes.

12  A.    -- 2020, I did not understand that she was a straw owner.

13  I had no under -- I had no reason to not believe that she

14  wasn't a true, 100 percent -- well, 75 percent Oklahoma

15  resident that is running the facility.

16  Q.    Your language --

17  A.    To be in control of --

18        MR. GOLDSTEIN:  Object.  Move to strike.

19  Q.    (BY MR. GOLDSTEIN) Your language that you say to him, your

20  words.  Remember Mr. Coffey asked you questions, Mr. Stacy said

21  hired -- did he hire Ms. Carrillo?  No, you know, language,

22  specific words.  Your words, "normal course of business would

23  be to see the owner."  That means the normal course of business

24  would have been for you to go see Ms. Carrillo in June of 2020.

25  A.    Why?

1  Q.   Because she's the owner.  She's the 75 percent owner.  You

2  just told him the normal course of business would be to see the

3  owner.  Those are your words.

4  A.   She was on more than 30 grows at that point, yes.  And we

5  had just inspected them.

6  Q.   You didn't say, "I'm here to see Ms. Carrillo because

7  she's on over 30 grows."  You didn't say, "I'm here to see

8  Ms. Carrillo because I think she's a straw owner." You said,

9  "I'm here to see her because that's the normal course of

10  business." Anyone would expect a law enforcement officer who is

11  giving out registrations to possess and distribute a controlled

12  substance would actually go see the people who are listed on

13  the applications.  That's my question.

14  A.   Can you rephrase that?

15          MR. COFFEY:  Objection.  Is there a question?

16          THE WITNESS:  I don't understand.

17          THE COURT:  I'm not sure what the question is either.

18  Q.   (BY MR. GOLDSTEIN) You told him it's normal course of

19  business.  Would that be normal course of business?

20  A.   Normal course of business, in this instance, in the way I

21  meant it, was she is on multiple registrations, so -- and I had

22  just done multiple inspections -- normal course of business was

23  to go talk to her about it.  That is the normal course of

24  business as I saw it.

25  Q.   And then you said, "Of course we're going to go see the 75

1  percent owner."  Right?

2  A.   On -- yes.  Because I'm talking to her about the grows

3  that are -- she's listed as 75 percent owner on.

4  Q.   You told Matt that you had been waiting on information

5  from him on two grows, Bison and Ping Two, right?

6  A.   Correct.

7  Q.   All right.  So at that point in time, March, of the

8  hundreds of clients that Mr. Stacy represented, you referenced

9  only two that you thought you were waiting on information from

10  him, right?

11  A.   As you can hear from the recording, I says (sic) these are

12  the ones I can remember off the top of my head, without having

13  anything in front of me.

14  Q.   Did you call him back afterwards?  Did you ever get back

15  to him and say I'm waiting on information from other grows?

16  A.   No.

17  Q.   Okay.  So that day you can remember two, right?  You

18  remembered one from August of 2020, right?

19  A.   Yes.

20  Q.   Okay.  And we already established that you weren't

21  accurate with him, you hadn't requested records on one of them,

22  so now we're down to one grow that you say you were waiting on

23  records for, right?

24  A.   It was my understanding that Russ had requested the

25  records for Marshall.

1   Q.   Well, that's not what you said on the tape, right?

2   A.   Okay.

3   Q.   Right?

4   A.   It is not said on tape.

5   Q.   Right.  No, you said, "I asked you for them on the call."

6   He said, "No, I thought you were getting me a list."  And you

7   said, "No, I told you on the call."  Remember that?

8   A.   No.  I mean, I believe Russ had requested the records.

9   Q.   Okay.

10  A.   For Bison Road.

11        MR. GOLDSTEIN:  Could I get my laptop screen, please?

12  Q.   (BY MR. GOLDSTEIN) So we're down to one grow, Ping, out of

13  the hundreds that he represents, right?

14  A.   Yes.

15  Q.   Right?

16       And here, on a week earlier, he told you he had some

17  records for Ping Two.

18  A.   That is the day after the call, correct.

19  Q.   Yeah.  The day after -- no, that call on 2/23 was for

20  Bison Road.

21  A.   Yes.

22  Q.   Right.  He's talking about Ping Two.

23  A.   Yes.  But I'm saying it's the day after, correct.

24  Q.   Right.  Well, it's not -- this isn't related to Bison,

25  this is related to Ping Two, right?

1   A.   Yes.

2   Q.   Right.  So this has nothing to do with Bison, this has to

3   do with Ping Two from August of 2020, right?

4   A.   I'm just timelining it.

5   Q.   Okay.  And so he tells you he has some receipts for you.

6   A.   Yes.

7   Q.   Did you do anything to follow up and go there, go to his

8   office, call him, tell him, can I have those?

9   A.   No.

10  Q.   Did you ever call him and ask him, can I get those records

11  again?

12  A.   No.  Matt Stacy had my email address and obviously my cell

13  phone number.

14  Q.   I know this is a recurring theme.  This is -- I mean, do

15  you expect lawyers to be calling police officers all the time?

16  Like, is a lawyer supposed to call someone, like -- what's

17  Mr. Williams' first name?  Your boss, I think.  Craig Williams.

18  You know, is Mr. Stacy, in conducting his law practice, and

19  he's sitting there and he's saying, well, they keep telling me

20  that it's lawful to grow before an OBN, I think I have a

21  responsibility to call Craig Williams, let me try and find him

22  and get his opinion on this.  Is that reasonable?

23  A.   I would assume that he's talking -- he's in contact with

24  Russ, our legal.

25  Q.   Yep.

ALICIA MARTINEZ - CROSS-EXAMINATION BY MR. GOLDSTEIN        411

1   A.   That if he has questions, that he would reach out to our

2   legal.

3   Q.   Yep.  Okay.  So very quickly.  Okay.  Exhibit 121, your

4   report, October 27, 2020, you went out to do an inspection of a

5   Helen Carrillo facility, right?

6   A.   Yes.

7   Q.   You say again that you received -- down at the bottom

8   here.  You received an OMMA report that was submitted by

9   attorney Matt Stacy saying that Nana Zhang is operational and

10  has 300 plants, right?

11  A.   Yes.

12  Q.   So again, further evidence that you actually were getting

13  OMMA reports that Mr. Stacy was filing reporting plant activity

14  at facilities without an OBN registration, right?

15  A.   Again, let me let you know, I did not get all of the OMMA

16  reports.  I was getting reports, as requested.  I did not have

17  access to all of the reporting.

18  Q.   You could get access if you asked for them, right?

19  A.   Not at that time, no.

20  Q.   How did you get this one?

21  A.   So OMMA had it where they had specific portal access,

22  where only so many portal accesses could get into the system

23  and view the OMMA reports.  So the agents did not have access,

24  but some of the analysts and some of the people in registration

25  had access.

1  Q.   You got access to this report, right?

2  A.   I would request it from my analyst and they would send me

3  what I was requesting.

4  Q.   You got access to this report, right?

5  A.   Yes.

6  Q.   That clearly showed Mr. Stacy was submitting reports that

7  there was grow activity at Nana Zhang, an unregistered

8  facility, in October of 2020, right?

9  A.   Yes.

10  Q.   That's a Helen Carrillo one, right?

11  A.   Yes.

12  Q.   So if you had called Mr. Stacy in October of 2020, perhaps

13  he would have explained his structure to you on that visit?

14  A.   Unknown.  I wasn't there.

15  Q.   Okay.  Another report of yours, this is Lama Green,

16  December 16, 2020, another of Mr. Stacy client, there's 20

17  greenhouses, ten actively growing marijuana, estimated 2,000

18  plants on the property.  Do you see that?

19  A.   Yes.

20  Q.   Another facility growing marijuana without an OBN

21  registration that you are actually aware of, right?

22  A.   Yes.

23  Q.   January 19, 2021, Jeff BC Properties, another Helen

24  Carrillo manufacturing before registration, right?

25  A.   Yes.

1  Q.   Actual knowledge by OBN, right?

2  A.   Yes.

3  Q.   No action taken, no law enforcement action taken, right?

4  A.   No.

5  Q.   One more example.  February 23, AL 2020, another

6  inspection, marijuana present.  Your report, growing without an

7  OBN registration, right?

8  A.   Yes.

9  Q.   No criminal action taken, no criminal enforcement taken,

10  no law enforcement taken, correct?

11  A.   Not at that time.

12  Q.   Another one February 23, this is with Peterson and Daphne

13  Green.  Again, more plants, no law enforcement activity,

14  correct?

15  A.   Correct.

16  Q.   This is Defendant's Exhibit 52.  Okay?  This is a table.

17  Have you ever seen this table where it notes all of your

18  recommended denials, but they're sitting at the OBN general

19  counsel office?  Have you seen this before?

20  A.   I don't know.

21  Q.   It says, "Agent Martinez is awaiting instruction from

22  Chief Williams on how you notify them of denial."  Do you see

23  that?  All down in the middle aisle.

24  A.   Okay.  If this was completed by our registration, that

25  means I denied, and then their registration is awaiting for

1   instruction, not me.

2   Q.   Okay.  All right.  In any event, you can see, let's say,

3   like the Johnson Group had been inspected or their application

4   was submitted in August and they still hadn't been notified of

5   their denial.  Do you see that?

6   A.   Yes.

7   Q.   Okay.  And then down here it says that -- all of these say

8   "out with Martinez," that's you, correct?

9   A.   Yes.

10  Q.   And you're awaiting clarification from legal.  Do you see

11  that?

12  A.   Yes.

13  Q.   Okay.  Just want to wrap up here, this is Defense Exhibit

14  A, for alpha, that's been identified.  Okay?  I just want to go

15  through this with you for a second.  All right?

16       So on June 4th of 2020, King Happy Farms, there was a

17  search warrant executed, they seized 14,000 plants, and they

18  were issued an OBN registration about a month later.  Are you

19  aware of that?

20  A.   No.

21  Q.   Okay.  Ping Two, you're aware of, right?  They were

22  inspected on July 1, 2020, they admit that they had been

23  growing for seven months without an OBN registration, and they

24  were granted an OBN registration about seven days later.  Do

25  you see that?

1    A.    Yes.

2    Q.    October 15th of 2020, you were at the Chow King

3    inspection.  That's what -- we heard the tape, right?

4    A.    Correct.

5    Q.    Agent Paulk tells Mr. Stacy, "Growth before registration

6    is fine, it's just an admin thing."  Right?

7    A.    Yes.

8    Q.    No denial was issued to them that day or in the months

9    that followed.  Are you aware of that?

10   A.    No.

11   Q.    Okay.  November 5, 2020, you visited Ying Liu, that's what

12   we just went through, those recordings, right?

13   A.    Yes.

14   Q.    Saw plants there, took no action, right?

15   A.    No.

16   Q.    Okay.  February 23rd, agents went to Earth Angel, saw

17   plants everywhere.  Told them it was fine, told them to get

18   some records together.  Are you aware of that?

19   A.    I'm aware that they went, but I was not present.

20   Q.    Okay.  You're aware that there were plants there, right?

21   A.    Yes.

22   Q.    All right.  They went to Daphne Green on the same day,

23   conducted an inspection, saw plants everywhere, took no law

24   enforcement action, right?

25   A.    No.

1    Q.   Mr. Grable, are you aware he told the agents in February

2    he had been growing for three months without an OBN

3    registration?  Are you aware of that?

4    A.   At Earth Angel?

5    Q.   Yeah.

6    A.   No, I was not.

7    Q.   They weren't denied notice in February 2021, right?

8    A.   I don't know.

9    Q.   Okay.  Ying Liu, that's where you had been at November

10   5th, right?  This is the Bison grow property.  You were back

11   there, that's the call we heard with Mr. Stacy, right?

12   A.   Yes.

13   Q.   You tell him there's a lot more than a thousand plants,

14   right?

15   A.   Yes.

16   Q.   No law enforcement action, right?

17   A.   No law enforcement action.

18   Q.   And then we just saw the Russ Cochran table, from May of

19   2021, where you're apparently awaiting clarification from legal

20   as to what to do to a variety of grows, and someone is waiting

21   on how to notify those people that their registration

22   applications have been denied, right?

23   A.   Yes.

24   Q.   Okay.

25          MR. GOLDSTEIN:  I have nothing further, Your Honor.

```
 1                 THE COURT:  Further questions?
 2                 MR. COFFEY:  Yes, Your Honor.
 3                           REDIRECT EXAMINATION
 4  BY MR. COFFEY:
 5  Q.   Agent Martinez, Mr. Goldstein showed you Defendant's
 6  Exhibit 108, this was an amended order to show cause related to
 7  the Ying Liu Green grow.  Do you remember it?
 8  A.   Yes.
 9  Q.   Did you serve this?
10  A.   Yes.
11  Q.   Okay.  On who?
12  A.   On the 25 percent owner.
13  Q.   Okay.  So would that be, I guess, whoever the -- well, not
14  Helen Carrillo, right?
15  A.   No, not Helen Carrillo.
16  Q.   Is a criminal statute listed there?
17  A.   Yes.
18  Q.   In addition to other administrative violations?
19  A.   Yes.
20  Q.   Because something -- at least when OBN is investigating
21  something, something can be both administrative and criminal,
22  can't it?
23  A.   Yes.
24  Q.   Mr. Goldstein put up a timeline.
25  A.   Yes.
```

1   Q.   Remember that last exhibit, demonstrative, he showed you?

2   A.   Yes.

3   Q.   Bunch of times there were inspections, and you guys found

4   marijuana and, to use his words, you did nothing?

5   A.   Those were his words.

6   Q.   Fair.  You did nothing, right?  You, Agent Martinez, did

7   nothing, right?

8   A.   Oh, I did not do nothing.

9   Q.   Okay.  I want you to be honest, you're under oath.  Were

10  you mad that you were not able to do anything?

11  A.   Yes.

12  Q.   And as you, Alicia Martinez -- you were an agent at OBN.

13  How many agents are at OBN?

14  A.   Back then?  Eighty to 100.

15  Q.   Eighty to 100.  And can you, Alicia Martinez, just decide,

16  you know what, I'm going to execute a search warrant right now?

17  Or do you require supervisor approval?

18  A.   A supervisor approval.

19  Q.   Okay.  And were there instances -- well, after all those

20  inspections where you found marijuana in late 2020 --

21  A.   Yes.

22  Q.   -- did you go ask for search warrants?

23  A.   Yes.

24  Q.   And were you told no?

25  A.   Yes.

1   Q.   And did you ask your boss, Craig Williams?

2   A.   Yes.

3   Q.   And he told you no, didn't he?

4   A.   Yes.

5   Q.   Why?

6   A.   I was told to continue with the investigation and gather

7   further evidence.

8   Q.   And could OBN have even executed search warrants on these

9   hundreds of grows Matt Stacy had set up at that moment, given

10  the resources OBN had?

11  A.   No.

12  Q.   And before you start executing search warrants on all of

13  these grows, wouldn't you want the full picture?

14  A.   I would want to know how many people are there, how many

15  weapons, are there dogs there, are there children there, what

16  kind of other threats are going to be at that location?  We

17  never serve a search warrant without doing our due diligence

18  for our safety and the safety of the public.

19  Q.   And with that in mind, wouldn't you want to know more

20  about Mr. Stacy before you start executing all of the search

21  warrants on grows he had set up?

22  A.   Yes, we did.  We wanted to gather more evidence and we

23  wanted to know the big picture.

24  Q.   Because had OBN ever faced a situation where an attorney

25  had set up hundreds of black-market grows?

1  A.   This was the first.

2  Q.   OBN was not equipped -- you guys were not equipped for

3  this, were you?

4  A.   No.

5  Q.   You were a kite dancing in the wind, if you will?

6  A.   Marijuana was very new to every agent at OBN as well.

7  Q.   And those decisions about how to proceed, how to build the

8  case against Matt Stacy, is that you, Agent Martinez, or

9  frankly, is that your bosses'?

10  A.   That was my chain of command, along with legal.

11  Q.   Including Craig Williams, right?

12  A.   Yes.

13  Q.   Okay.  Let's talk a little bit about Mr. Stacy's grows.

14  How many marijuana grows do you think that you have inspected

15  -- well, first, just in general, not just Mr. Stacy's grows?

16  A.   I can't even dare to guess.

17  Q.   More than a hundred?

18  A.   Probably.  I mean, that number is somewhere between 10 and

19  200.

20  Q.   And have you ever gone out to a grow and found that it is

21  fully compliant?

22  A.   Yes.

23  Q.   Okay.  Have you ever gone out to one of Matt Stacy's grows

24  that he set up and found out that it was fully compliant?

25  A.   No.

1  Q.   Okay.  And on that note, is that why you were a little

2  angry when you went out to the grow in Perkins, Chow King Z,

3  where you had to "go take a walk"?

4  A.   I was very upset knowing that not a single one of the

5  security measures were met.  They were growing, and it was

6  growing in a barn-like structure that had no lock on the barn

7  door at all.

8  Q.   They're just growing weed in a barn, no lock?

9  A.   Correct.

10 Q.   They have security cameras?

11 A.   No.

12 Q.   Did they have any records on site?

13 A.   No.

14 Q.   Was there anything to distinguish this farm from a plain

15 old-fashioned black-market operation?

16 A.   No.

17 Q.   And you were mad about it, weren't you?

18 A.   I was.

19 Q.   And your boss wouldn't let you do a search warrant?

20 A.   That's part of why I was probably mad was I knew what was

21 coming.

22        THE COURT:  Let me intercede a question here.  I

23 assume that in addition to Mr. Stacy and the facilities that he

24 was involved with, you went to others -- other facilities,

25 grows, people that were applying for registration?

```
 1              THE WITNESS:  Yes.
 2              THE COURT:  Many of them?
 3              THE WITNESS:  Many.
 4              THE COURT:  So was it routine that people were
 5   growing in advance of getting registration?
 6              THE WITNESS:  No.  It wasn't normally routine.
 7              THE COURT:  Okay.
 8              THE WITNESS:  I mean --
 9   Q.  (BY MR. COFFEY) I want to make sure you have the chance to
10   say whatever you need to on that note.  I mean, I don't know
11   how you're interpreting "routine."
12   A.   And I say "routine."  I can only speak for the grows that
13   I went to, as far as routine is many of the grows that I went
14   to that were not related to Matt Stacy were not growing without
15   prior approval.  So routine, that's not -- that was not my
16   routine.  It might have been for other agents, but that was not
17   the normal things that happened for me.
18   Q.   So was it your experience that when you went and inspected
19   grows that Matt Stacy had set up, those grows were more often
20   than not operating without a registration?
21   A.   I can't say more often than not, but there were, as
22   defense has pointed out, they pointed very -- quite a few of
23   them that were growing without.
24   Q.   Did it appear that the grows that Mr. Stacy was setting up
25   were more likely to have problems with security measures and to
```

1  operate without a registration more so than other grows that
2  you went to that weren't associated with Mr. Stacy?
3  A.   Yes.
4  Q.   Okay.  Now, apparently you -- and I want to make sure I'm
5  understanding your testimony about the phone call with
6  Mr. Stacy, because I think this is very important.  Yeah, you
7  caught him cold, wouldn't you agree, you caught him cold?
8  A.   Yes.
9  Q.   He didn't have a chance to plan what he was going to tell
10  agents, did he?
11  A.   No.
12  Q.   He didn't have a chance to think about how he was going to
13  describe his business structure, did he?
14  A.   No.
15  Q.   Even though he had probably already described it to
16  clients hundreds of times?
17  A.   Clients and apparently OMMA.
18  Q.   On that note, do you know if Mr. Stacy, whenever he would
19  apply at OMMA, the separate contractual agreements with the
20  licensing company, the Carrillos, would license away all their
21  rights, responsibilities, and contracts and anything else
22  associated with the marijuana grow?  Do you know if he provided
23  that contract to OMMA?
24  A.   I have no idea.
25  Q.   Okay.  Now, back to the phone call.  Mr. Goldstein asked

1  you a series of questions.  And he said, Did Matt Stacy tell

2  you this?  Did he tell you that?  Did he tell you X, Y, and Z?

3  Do you remember that?

4  A.   Yes.

5  Q.   And you answered, yes, he did tell me that.

6  A.   Yes.

7  Q.   Is it your testimony today that Matt Stacy was honest with

8  you in that phone call?

9  A.   No.

10 Q.   Why?

11 A.   As Helen Carrillo stated at the beginning of the interview

12 that she did not understand or know the business structure, and

13 she did not hire out any companies.  And Matt Stacy said she,

14 she, she, she hired out.

15 Q.   And had Ms. Carrillo actually hired anybody out?

16 A.   According to her, no.

17 Q.   And at that moment, when the phone call ended -- or by

18 that moment, when the phone call ended, was Matt Stacy a

19 criminal -- target of a criminal investigation in your mind, at

20 least by the end of the phone call March 1, 2021?

21 A.   Yes.

22 Q.   Okay.  And were you going to tell him on the phone that,

23 yeah, I suspect you have committed a massive fraud?

24 A.   No.

25 Q.   Why?

 1  A.   Why does any law enforcement that's interviewing a suspect

 2  going to lay out charges so that they'll explain everything to

 3  them?  They don't.  You don't have to have -- you don't have to

 4  tell them criminal.

 5  Q.   And does that make the suspect's conduct any less

 6  criminal?

 7  A.   No.

 8  Q.   Okay.

 9           MR. COFFEY:  Pass the witness.

10           THE COURT:  Mr. Goldstein, further questions?

11           MR. GOLDSTEIN:  Thank you, Your Honor.

12                         RECROSS-EXAMINATION

13  BY MR. GOLDSTEIN:

14  Q.   So if I'm understanding the questioning correctly, you

15  thought there was a sufficient basis to initiate a search for a

16  crime and you were overridden by your superiors?

17  A.   You'll have to be -- explain a little more.

18  Q.   Well, I think Mr. Coffey just asked you if you wanted to

19  execute a search warrant, you said require a supervisor

20  approval and the supervisor said no?

21  A.   Correct.

22  Q.   So the people above you had made a decision that they

23  didn't want to pursue law enforcement action; is that what

24  you're saying?

25  A.   That's what I'm saying on those specific instances, not as

1  a whole.

2  Q.    Okay.  Now, you said -- Mr. Coffey asked you a question

3  that you needed to gather further evidence of hundreds of

4  grows.  Do you remember that line of questioning, that you

5  needed to go gather, couldn't execute hundreds of search

6  warrants at the same time?

7  A.    No.

8  Q.    How about one?

9  A.    What about how about one?

10 Q.    Did you have enough capacity to execute a search warrant

11 at Ying Liu in November when you saw plants inside?

12 A.    Yes, we had the manpower.

13 Q.    Did you have the manpower to execute search warrant at

14 Earth Angel on February 23rd when you saw drugs all over the

15 place without an OBN registration?

16 A.    I never was at Earth Angel, sir.

17 Q.    How about one of the other ones you were at?  Lama Green.

18 A.    Lama Green was a very large property and it probably would

19 have taken more than 50 agents.

20 Q.    Okay.  But you didn't have to execute a search warrant at

21 hundreds, right, you could have started at one, right?  You

22 don't have to execute warrants simultaneously at a hundred

23 different grows.  If you see a crime at one grow on one

24 particular day, you could execute a search warrant on that day,

25 right?

1   A.    Barring that our administration also agrees with that,

2   correct.

3   Q.    So it was your administration at OBN that didn't agree

4   with your conclusion that there was sufficient basis to execute

5   a search warrant?

6   A.    You're talking very broad.  We've talked -- I talked to my

7   administration multiple times about different grows, so --

8   Q.    And who did you talk to, when did you talk to them, and

9   when did they reject your application?

10  A.    Sir, I don't have an answer for that.

11  Q.    Name one person you spoke to that overrode your request to

12  a search warrant?

13  A.    I spoke with my supervisors, Blaine and Craig.

14  Q.    Last names, please.

15  A.    Blaine Phillips and Craig Williams.

16  Q.    And when was that and regarding what grow?

17  A.    Sir, I don't have an answer for you.  I don't know.  This

18  was four, almost five years ago.

19  Q.    Okay.  And so you spoke to them?

20  A.    I cannot give you a date.  I cannot give you specifics

21  about which grow it was.

22  Q.    And was that -- so how many grows did you make requests

23  that were rejected by your superiors?

24  A.    Sir, I don't have an answer for you.

25  Q.    Okay.  So Mr. Coffey showed you this.  Said, "Respondent

1  was illegally cultivating marijuana in violation of Section

2  2-509 and 2-304."  Do you see that?

3  A.    Yes.

4  Q.    Those are not the state statutes for unlawful possession,

5  distribution of marijuana, right?

6  A.    5-0, I'm not -- 509 -- exactly sure which one that is.

7  Q.    That's growing wild plants.  Did you know that?

8  A.    No, I did not.

9  Q.    So when he says that there is criminal -- there's criminal

10  statutes cited, the criminal statute cited is growing a wild

11  plant.  It's not possessing -- unlawful possession of

12  marijuana, distribution, those are found at 2-401, et seq.,

13  right?

14  A.    Is that 401?

15  Q.    You don't know that?

16  A.    I am not a hundred percent sure of the numbers, sir.

17  Q.    Okay.  You said that you needed to understand the full

18  picture before -- apparently as part of your investigation of

19  Mr. Stacy, right?

20  A.    The full picture?

21  Q.    I think that's what you testified to.

22  A.    Right.

23  Q.    The reason why you didn't apparently confront him as a

24  criminal suspect on March 1st of 2021.

25  A.    An ongoing investigation, yes.

1  Q.   And you spoke to the Carrillos on March 1st and March 2nd,

2  right?

3  A.   I spoke to Helen briefly on March 2nd and Rafael, in

4  extent, on March 2nd.

5  Q.   Okay.  What more did you need?  You had Mr. Stacy talking

6  to you on the phone about grows without an OBN registration

7  going back with you, personally, to October of 2020, right?

8  A.   Correct.

9  Q.   You have gone to clients of his that have grows without

10 OBN registrations and openly talking to them about having

11 marijuana at the facilities, right?

12 A.   Yes.

13 Q.   You talked to Mr. Stacy on March 1st, he explained to you

14 his business structure, right?

15 A.   Yes.

16 Q.   Are you aware that he then went in and sat with general

17 counsel at OBN, Russ Cochran, in multiple meetings beginning in

18 May and ending in June of 2021 where they had an ongoing

19 dialogue regarding the business structure that he employed?

20 A.   No.

21 Q.   Okay.  You also said that to do search warrants, you

22 needed to make sure that -- you know, you needed to know what

23 was going on inside, make sure dogs and some other things,

24 right?

25 A.   Yes.  There's a lot to go into a search warrant.

```
 1   Q.   But you were physically inside of these grows.  You knew
 2   exactly what was inside of them, right?  It wasn't a shock.
 3   You went in and you saw the grows.
 4   A.   At that moment, yes.
 5   Q.   Right.  Still no law enforcement action, right?  Correct?
 6   A.   Yes.
 7           MR. GOLDSTEIN:  Nothing further, Your Honor.
 8           THE COURT:  You may step down.  Anything further?
 9           MR. COFFEY:  No further witnesses, Your Honor.
10           THE COURT:  Anything further, Mr. Goldstein?
11           MR. GOLDSTEIN:  Nothing further, Your Honor.  Thank
12   you.
13           THE COURT:  All right.  Well, what I am going to
14   suggest, as opposed to hearing closing arguments on this
15   hearing, is that you submit contemporaneously suggested
16   findings of fact and conclusions of law.  And I'll be guided by
17   you how much time you need for that.
18           MR. GOLDSTEIN:  Would 30 days be acceptable?  Do you
19   want it sooner?
20           THE COURT:  I'd like to get --
21           MR. GOLDSTEIN:  Fourteen days, Your Honor?
22           THE COURT:  I'm sure everybody has got lots to do.
23   If you can do it in 14 days, that would be great, but if you
24   need additional time, Mr. Goldstein, I'm amenable.
25           MR. GOLDSTEIN:  I think I would like to get the
```

1    transcript, if I could.

2             THE COURT:  Why don't we say three weeks.

3             MR. GOLDSTEIN:  All right.  Fine.

4             THE COURT:  Anything else we need to take up?

5             MR. COFFEY:  No, Your Honor.

6             MR. GOLDSTEIN:  Thank you for your time, Your Honor.

7             THE COURT:  All right.  Court will be in recess.

8         (COURT ADJOURNED.)

9                    CERTIFICATE OF OFFICIAL REPORTER

10            I, Tracy Thompson, Federal Official Realtime Court

11   Reporter, in and for the United States District Court for the

12   Western District of Oklahoma, do hereby certify that pursuant

13   to Section 753, Title 28, United States Code that the foregoing

14   is a true and correct transcript of the stenographically

15   reported proceedings held in the above-entitled matter and that

16   the transcript page format is in conformance with the

17   regulations of the Judicial Conference of the United States.

18                    Dated this 5th day of February 2025.

19

20                    /S/ Tracy Thompson
                       ------------------------------
21                    Tracy Thompson, RDR, CRR
                       Federal Official Court Reporter
22

23

24

25